OPINIONS OF THE SUPREME COURT OF OHIO

**** SUBJECT TO FURTHER EDITING ****

      The full texts of the opinions of the Supreme Court of
Ohio are being transmitted electronically beginning May 27,
1992, pursuant to a pilot project implemented by Chief Justice
Thomas J. Moyer.
      Please call any errors to the attention of the Reporter's
Office of the Supreme Court of Ohio.  Attention:  Walter S.
Kobalka, Reporter, or Deborah J. Barrett, Administrative
Assistant.  Tel.:  (614) 466-4961; in Ohio 1-800-826-9010.
Your comments on this pilot project are also welcome.
      NOTE:  Corrections may be made by the Supreme Court to the
full texts of the opinions after they have been released
electronically to the public.  The reader is therefore advised
to check the bound volumes of Ohio St.3d published by West
Publishing Company for the final versions of these opinions.
The advance sheets to Ohio St.3d will also contain the volume
and page numbers where the opinions will be found in the bound
volumes of the Ohio Official Reports.

The State of Ohio, Appellee, v. Bidinost, Appellant.
[Cite as State v. Bidinost (1994),    Ohio St.3d    .]
Evidence -- Witnesses -- Post-traumatic stress disorder in
      children is a proper subject for expert testimony -- R.C.
      2933.52(A) prohibition of purposeful interception of wire
      or oral communications through use of an interception
      device applicable to cordless telephone communications.
1.    Post-traumatic stress disorder in children has gained
      sufficient recognition in the psychiatric profession to be
      considered a proper subject for expert testimony.
2.    The provisions of R.C. 2933.52(A), prohibiting the
      purposeful interception of wire or oral communications
      through the use of an interception device, apply to
      cordless telephone communications that are intentionally
      intercepted and recorded.
                              ---
      (No. 93-1667 -- Submitted November 16, 1994 -- Decided
December 30, 1994.)
      Appeal from the Court of Appeals for Cuyahoga County, No.
62925.
      Keith and Maria Crippen, husband and wife, are the parents
of three children, Randall Jeremy Crippen, born August 6, 1984,
Christopher Andrew Crippen, born December 21, 1986, and Nicole
Crippen, born April 20, 1989.  At all relevant times, the
Crippen family lived next-door to the Bidinost family.  Members
of the Bidinost family included Ivo Bidinost Jr., appellant,
Pia Bidinost, appellant's mother, and appellant's father and
sister.
      In 1986, Pia Bidinost began baby-sitting Randy Crippen.
After Christopher Crippen was born, Pia baby-sat for both Randy
and Christopher.  Pia baby-sat for the children because both
Keith and Maria Crippen were employed.  Initially, Randy seemed
to enjoy going to the Bidinost residence for Pia to baby-sit
him.  However, sometime later, Randy began to resist going to
the Bidinosts' home, and Maria noticed that both Randy's and

Christopher's penises were red and swollen. Maria thought that Pia may not have been changing the children's diapers often enough. Pia indicated that she had been regularly changing the children's diapers. Pia continued to baby-sit for the children until Maria decided to stay at home to care for the boys.

After Pia stopped baby-sitting for the children, both boys continued to visit the Bidinosts. According to Keith Crippen, the Bidinosts often invited the children to the Bidinost residence. Additionally, appellant and appellant's sister occasionally baby-sat the children or would ask the Crippens if the children could visit.

During and after the time that Pia baby-sat the children, Keith and Maria Crippen noticed that the children exhibited certain abnormal behaviors. Specifically, Christopher and Randy would urinate and/or defecate outdoors. Christopher developed a fear of going to the toilet and would sometimes urinate in his bed. Randy wanted others to watch him undress and to observe him using the toilet. Randy also desired to watch others undress and use the toilet. Randy's teachers noticed that he was hostile, overly aggressive and overly affectionate. On numerous occasions, Maria observed the boys outside with their pants down. On one occasion, she observed the boys preparing to drink from a cup in which they had urinated. On another occasion, she caught Randy "sucking on Christopher's penis" in the bathtub. Randy had attempted this same sexual behavior with his father in the shower.

The Crippens suspected that Randy and Christopher had been sexually abused. They took the children to the Center for Human Services. Later, the children were seen and were counselled by Dr. George Houck. Houck attempted, without success, to get the boys to identify their sexual abuser. Subsequently, Maria once again caught Randy sucking Christopher's penis. She eventually took the children to Dr. Lois McLatchie. After two or three sessions with McLatchie, Christopher revealed to Maria that appellant had played "the private game." Christopher told Maria that Randy had sucked appellant's penis and that appellant had sucked Randy's penis. Christopher was also able to describe ejaculation and semen. According to Maria, Randy eventually admitted that appellant had abused him.

On August 28, 1990, appellant was indicted on multiple counts of rape in violation of R.C. 2907.02 and counts of felonious sexual penetration in violation of R.C. 2907.12. On August 29, 1990, appellant was arrested at his home and was advised of his Miranda1 rights. During a search of the Bidinost residence, patrolman Lawrence Brazie of the Mayfield Heights police department heard appellant either say "My life is over," or "My life is ruined."

The day after appellant's arrest, Maria Crippen inadvertently discovered that a baby monitor in her home was capable of intercepting cordless telephone communications from the Bidinosts' residence. Maria was able to hear the voices of persons using the Bidinosts' cordless telephone. However, Maria was unable to hear the voices of those with whom the Bidinosts were communicating. Maria was instructed by the police and prosecutor to record the conversations. The recorded statements were eventually used at trial to impeach

the testimony of appellant's father and sister.

On October 11, 1991, the matter proceeded to trial before a jury. At the time of trial, Randy was seven-years-old and Christopher was four. Following a voir dire examination of the children, the trial judge determined that Randy and Christopher were competent to testify.

At trial, Randy testified that he and Christopher had played the "private part[s] game" with appellant. According to Randy, the game consisted of appellant studying and sucking Randy's penis, and Randy sucking appellant's penis while putting a popsicle stick in appellant's rectum. Randy stated that it "tickled" when appellant sucked his penis, but that it did not feel very good when appellant used the stick on him. Randy testified that he played the private game with appellant because appellant had threatened to hurt him. According to Randy, appellant had played the game with Randy and Christopher approximately three hundred times.

At trial, Christopher claimed that he had never played the private game. However, Christopher testified that Randy and appellant had played the game. Christopher testified that appellant did not wear clothes during the game, and that Randy and appellant had touched each other with a stick.

Dr. Robert M. Reece, a pediatrician, testified that Randy and Christopher had been sexually abused. Reece based his conclusions on the behavioral symptoms of the children. Additionally, a physical examination of Christopher revealed that he had an anal fissure which, according to Reece, could have been caused by a popsicle stick.

Dr. Jane C. Timmons-Mitchell, a clinical psychologist, testified that she had met with Randy and Christopher on numerous occasions. Based upon her examination of the children, Timmons-Mitchell testified that both Randy and Christopher suffered from post-traumatic stress disorder.

Appellant testified on his own behalf and denied the charges against him. Appellant's father and sister testified that they never saw appellant engage in any improper behavior with the Crippen children.

On October 28, 1991, the jury returned its verdicts, finding appellant guilty on five counts of rape in violation of R.C. 2907.02 and one count of felonious sexual penetration in violation of R.C. 2907.12. The trial court entered judgment upon the verdicts and sentenced appellant in accordance with law. On appeal, the court of appeals affirmed the judgment of the trial court.

The cause is now before this court pursuant to the allowance of a motion for leave to appeal.

Stephanie Tubbs-Jones, Cuyahoga County Prosecuting Attorney, and Melody A. White, Assistant Prosecuting Attorney, for appellee.

David L. Doughten, for appellant.

Douglas, J.   Appellant presents three propositions of law for our consideration. For the reasons that follow, we find no reversible error with respect to any of the issues raised in this appeal and, accordingly, we affirm the judgment of the court of appeals. We address appellant's propositions

of law seriatim.

I

In his first proposition of law, appellant challenges his convictions, claiming that the trial court erred in permitting Timmons-Mitchell to offer her expert opinion that Randy and Christopher suffered from post-traumatic stress disorder. We reject appellant's proposition for two reasons. First, appellant's arguments in support of the proposition have been waived because he failed to raise the alleged errors at the trial court level. State v. Williams (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus; State v. Broom (1988), 40 Ohio St.3d 277, 288-289, 533 N.E.2d 682, 695-696; and State v. Moreland (1990), 50 Ohio St.3d 58, 62, 552 N.E.2d 894, 899. Second, even considering the merits of appellant's contentions, we find that the trial court did not abuse its discretion in allowing Timmons-Mitchell to testify that the children suffered from post-traumatic stress disorder.

Appellant contends that Timmons-Mitchell lacked sufficient qualifications to testify as an expert concerning post-traumatic stress disorder in children. We disagree. The record reflects that Timmons-Mitchell, a licensed clinical psychologist, had extensive education and experience in evaluating children who were victims of sexual or physical abuse. In addition, Timmons-Mitchell is an assistant professor of psychology at Case Western Reserve University School of Medicine and director of the child abuse treatment programs in the Division of Child Psychiatry at University Hospitals. She has evaluated and treated hundreds of children, testified as an expert witness in at least fifteen cases, and published various articles regarding children, including an article relating to post-traumatic stress disorder. Clearly, the trial court did not abuse its discretion in recognizing Timmons-Mitchell as an expert in her field based upon her knowledge, skill, education, experience and training.

Appellant also contends that post-traumatic stress disorder in children is not a proper subject for expert testimony. Specifically, appellant claims that "[t]here is no evidence that post-traumatic stress in children has been accepted by the scientific community." Again, we disagree. "Post-traumatic stress disorder" is specifically identified in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders ("DSM-III-R") (3 Ed. Rev. 1987) 247-251, Section 309.89. The disorder is essentially the development of various characteristic symptoms[2] following the exposure to a "psychological distressing event that is outside the range of usual human experience." Id. at 247. The event causing the disorder may include rape and assault. Id. at 248. Most notably, the disorder is not age-specific. It can afflict adults and children. Id. at 249. Accordingly, we are convinced that post-traumatic stress disorder in children has gained sufficient recognition in the psychiatric profession to be considered a proper subject for expert testimony. Our conclusion is supported by the decisions of a number of courts which have, before us, considered the specific issue or have been confronted with an analogous situation. See, e.g., State v. Hall (1992), 330 N.C. 808,

818-823, 412 S.E.2d 883, 888-891.  See, also, State v. Vorisek (May 11, 1988), Summit App. No. 13334, unreported; Commonwealth v. Hudson (1994), 417 Mass. 536, 631 N.E.2d 50; and State v. Fasy (Colo. 1992), 829 P.2d 1314.

Additionally, it is well-settled that expert testimony is admissible if it will assist the trier of fact in understanding the evidence in the case or in determining a fact in issue. State v. Boston (1989), 46 Ohio St.3d 108, 118, 545 N.E.2d 1220, 1231.  Such testimony must be beyond the common knowledge of the jurors.  State v. Koss (1990), 49 Ohio St.3d 213, 216, 551 N.E.2d 970, 973.  See, also, State v. Buell (1986), 22 Ohio St.3d 124, 131, 22 OBR 203, 209, 489 N.E.2d 795, 803.

Here, a review of the record reveals that Timmons-Mitchell's testimony was admissible under Evid.R. 702.3  Timmons-Mitchell testified that her function was not to determine whether the children had been sexually abused. Rather, Timmons-Mitchell examined the children to assess whether they had suffered any psychological trauma as a result of the alleged abuse.  At trial, Timmons-Mitchell described various relevant symptoms of post-traumatic stress disorder, explained that many of the symptoms had been exhibited by the children, testified that the children suffered from this disorder and stated that such a diagnosis is widely applied to children who have been sexually abused.  The expert testimony was clearly relevant and helpful in assisting the jury to understand the children's behavior.  Additionally, the expert testimony provided information to the jury that was "'"sufficiently beyond common experience."'"  Buell, supra, at 131, 22 OBR at 209, 489 N.E.2d at 803.  We specifically reject appellant's argument that the evidence should have been excluded under Evid.R. 403.4

Accordingly, we find that appellant's first proposition of law lacks merit.

II

On August 29, 1990, police conducted a search of appellant's residence.  During the search, Patrolman Lawrence Brazie heard appellant either say "My life is over" or "My life is ruined."  At trial, the state called Brazie to testify regarding appellant's statement.  Appellant objected on grounds that, during discovery, the state had failed to provide the defense with a written summary of appellant's oral statement. The trial court permitted the parties to voir dire Brazie.  On voir-dire examination, Brazie testified that he had met with defense counsel approximately two months before trial and had verbally informed the defense of appellant's pretrial statement.  On the basis of this testimony, the trial court permitted Brazie to testify as to the statement made by appellant during the August 29, 1990 search.

In his second proposition of law, appellant claims that the state violated the criminal rules of discovery by failing to provide the defense with a written summary of appellant's oral statement.  Appellant suggests that the trial court committed reversible error in permitting Brazie to testify.

Crim.R. 16(B)(1)(a) provides, in part:

"Upon motion of the defendant, the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph any of the following which are available to,

or within the possession, custody, or control of the state, the existence of which is known or by the exercise of due diligence may become known to the prosecuting attorney:

"* * *

"(ii) Written summaries of any oral statement, or copies thereof, made by the defendant or co-defendant to a prosecuting attorney or any law enforcement officer;

"* * *."

The record is clear that the state violated Crim.R. 16(B)(1)(a)(ii) by failing to provide defense counsel with a written summary of appellant's oral statement. At trial, an assistant prosecuting attorney, Melody A. White, explained to the court that no written summary had been provided to the defense during discovery because the defense had been verbally informed of appellant's statement to Brazie. In this regard, White argued that the "spirit of the law had been fulfilled." She stated, "why should I reduce something to writing for mere technicality for information he [appellant's defense attorney] already has notice of * * *[?]". She stated further, "[s]hould I have reduced this to writing? Absolutely. I personally try to do things to not waste my time."

Contrary to White's assertions, the "spirit of the law" was not fulfilled by anything less than strict adherence to the rule. As White correctly recognized, Crim.R. 16(B)(1)(a)(ii) required that she reduce the statement to writing, in the form of a summary, to be provided to the defense during discovery. Obviously, we did not draft the criminal rules of discovery to waste anyone's time. Rather, we specifically drafted the rules to ensure the fairness of criminal proceedings.

Having determined that the criminal rules of discovery were violated, we must now examine whether the trial court erred in allowing Brazie to testify.

Crim.R. 16(E)(3) provides for the regulation of discovery and permits a trial court to exercise discretion in selecting the appropriate sanction for a discovery violation. See State v. Wiles (1991), 59 Ohio St.3d 71, 78, 571 N.E.2d 97, 110; State v. Parson (1983), 6 Ohio St.3d 442, 445, 6 OBR 485, 487, 453 N.E.2d 689, 691; and State v. Edwards (1976), 49 Ohio St.2d 31, 42, 3 O.O.3d 18, 24, 358 N.E.2d 1051, 1059. Crim.R. 16(E)(3) provides that:

"If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances."

In Parson, supra, at the syllabus, this court held that:

"Where, in a criminal trial, the prosecution fails to comply with Crim.R. 16(B)(1)(a)(ii) by informing the accused of an oral statement made by a co-defendant to a law enforcement officer, and the record does not demonstrate (1) that the prosecution's failure to disclose was a willful violation of Crim.R. 16, (2) that foreknowledge of the statement would have benefited the accused in the preparation of his defense, or (3) that the accused was prejudiced by admission of the statement,

the trial court does not abuse its discretion under Crim.R. 16(E)(3) by permitting such evidence to be admitted."

Applying Parson to the case at bar, we find that the trial court did not abuse its discretion in permitting Brazie to testify as to the oral statement made by appellant.

First, we are not persuaded that the assistant prosecutor willfully violated Crim.R. 16. The trial court found that the defense had been verbally notified of the statement in question approximately two months prior to trial. Apparently, the assistant prosecutor assumed that the verbal notification had satisfied her obligations under Crim.R. 16(B)(1)(a)(ii). Although the assistant prosecutor's assumption was clearly erroneous, that assumption does not automatically equate with a willful violation of the rule.

Second, we are in no position to second-guess the trial court's determination that defense counsel had been verbally notified of appellant's statement to Brazie. While the defense was entitled to a written summary of the statement, the record does not reflect that a written summary would have benefited appellant in the preparation of his defense.

Third, appellant never requested a continuance to prepare for Brazie's trial testimony. Under these circumstances, the trial court may have properly determined that appellant was prepared to proceed despite any claim of unfair "surprise." Thus, no prejudice has been shown.5

In this proposition, appellant also claims that because Brazie could not specifically recall which statement appellant had made (either "My life is over" or "My life is ruined"), the probative value of the evidence was outweighed by its prejudicial effect. Appellant argues that "[t]here is a tremendous difference between whether the appellant said 'my life is over' or 'my life is ruined.' The statement 'my life is over' connotes a strong suggestion the he is admitting guilt in that his offense was discovered. 'My life is ruined,' on the other hand, might indicate that the charges themselves could very easily ruin his life, whether or not they were true." Therefore, appellant contends that the evidence should have been excluded under Evid.R. 403(A). We disagree. The fact that Brazie could not recall which of the statements was made by appellant affected the credibility -- not the admissibility -- of Brazie's testimony. Whether appellant said "My life is over," or "My life is ruined," made little difference. The jury could reasonably have concluded that either version of the statement indicated consciousness of guilt. Similarly, the jury could reasonably have concluded that either statement pertained to the effect of the charges on appellant's life. The weight to be given Brazie's testimony was clearly a matter for the jury.

Accordingly, we reject appellant's second proposition of law.

                              III

Appellant's third proposition of law concerns the recorded telephone conversations that were used to impeach the credibility of two defense witnesses. The facts relevant to this proposition are as follows.

The Crippens and Bidinosts were neighbors. The Bidinosts owned a cordless telephone. Keith and Maria Crippen owned an

electronic baby monitor which they used to monitor their children. The transmitting part of the baby monitor was located in Nicole's bedroom and the receiving part was kept in the Crippens' bedroom. The day following appellant's arrest, Christopher and Randy Crippen were playing with the baby monitor. When the boys unplugged the transmitting device in Nicole's bedroom, the receiver in the Crippens' bedroom began receiving the Bidinosts' cordless telephone conversations. Only the voices of those speaking into the Bidinosts' cordless telephone handset could be heard over the monitor. The voices of those to whom the Bidinosts were speaking could not be overheard. Maria Crippen contacted police and a prosecuting attorney, and was instructed by them to record any subsequent conversations received over the baby monitor. In accordance with these instructions, Maria recorded the Bidinosts' cordless telephone communications. In October 1990, she turned the tapes over to police.

In December 1990, appellant filed a motion to suppress the "intercepted oral communications." On August 5, 1991, the trial court conducted a hearing on appellant's motion. At the hearing, John P. Wykoff who worked on transmission devices, testified concerning the technical operations of cordless telephones. Wykoff explained that when a person speaks into the handset of a cordless phone, an FM signal is transmitted into the air through the antenna located on the handset. The radio transmission from the handset is then received by the base unit which, in turn, is connected with the telephone line. The testimony at the hearing indicated that when the transmitting unit of the Crippens' baby monitor became unplugged, the receiving unit of the monitor began intercepting radio signals from the Bidinosts' cordless telephone handset.

The trial court denied appellant's motion to suppress. The court held that a person who uses a cordless telephone "does so at his own peril," and that there was no necessity for the state to secure a warrant to monitor "radio communications * * * open to everyone who had * * * FM receiving equipment." The court of appeals affirmed the judgment of the trial court on this issue.

In his third proposition of law, appellant contends that the trial court erred in denying his motion to suppress the contents of the recorded telephone conversations. Appellant contends that R.C. 2933.52 prohibited the interception and taping of the conversations, and that R.C. 2933.636 required that the contents of the intercepted communications be suppressed.

Appellant's contentions present this court with an issue of first impression involving the rights of Ohioans to be free from unauthorized invasions of their cordless telephone communications. R.C. 2933.52(A) provides that:

"(A) No person purposely shall do any of the following:

"(1) Intercept, attempt to intercept, or procure any other person to intercept or attempt to intercept any wire or oral communication;

"(2) Use, attempt to use, or procure any other person to use or attempt to use any interception device to intercept any wire or oral communication, if either of the following apply:

"(a) The interception device is affixed to, or otherwise

transmits a signal through, a wire, cable, satellite, microwave, or other similar method of connection used in wire communications;

"(b) The interception device transmits communications by radio, or interferes with the transmission of communications by radio.

"(3) Disclose, or attempt to disclose, to any other person the contents, or any other evidence derived from the contents, of any wire or oral communication, knowing or having reason to know that the contents, or evidence derived from the contents, was obtained through the interception of the wire or oral communication in violation of sections 2933.51 to 2933.66 of the Revised Code." (Emphasis added.)

With certain exceptions not pertinent here, R.C. 2933.52(A) prohibits a person from purposely intercepting a wire or oral communication.7 Maria Crippen overheard and recorded cordless telephone conversations to which she was not a party through the use of her electronic baby monitor device. She did so at the urging of the police and prosecutor who did not attempt to obtain an interception warrant. Obviously, the monitoring of the conversations was purposely done. Thus, R.C. 2933.52(A) prohibited this conduct if the act of monitoring the cordless telephone conversations constitutes an "interception" of "wire communication[s]" or "oral communication[s]."

R.C. 2933.51(A) defines "wire communication" as "any communication that is made in whole or in part through the use of facilities for the transmission of communications by the aid of wires or similar methods of connecting the point of origin of the communication and the point of reception of the communication." Division (B) of the statute defines "oral communication" as "any human speech that is used to communicate by one person to another person." The term "intercept" is defined in R.C. 2933.51(C) as "the aural acquisition of the contents of any wire or oral communication through the use of an interception device." R.C. 2933.51(D) defines an "interception device" as "any electronic, mechanical, or other device or apparatus that can be used to intercept a wire or oral communication."

Appellee contends that the cordless telephone conversations received over the Crippens' baby monitor were not "oral communications" within the meaning of R.C. 2933.51(B). Appellee suggests that the monitor received "radio waves" transmitted from the Bidinosts' cordless telephone handset. However, we find that the cordless telephone communications received over the monitor were clearly "oral communications" as defined in R.C. 2933.51(B). The voices heard over the Crippens' baby monitor came from the Bidinosts' cordless telephone handset when the Bidinosts used the telephone to communicate with others. Maria Crippen did not hear and record "radio waves." Rather, she heard and recorded people speaking on a cordless telephone. The definition of "oral communication" in R.C. 2933.51(B) is not specifically limited to face-to-face human speech. The definition refers to any human speech used to communicate by one person to another.

Additionally, appellant correctly recognizes that cordless telephone conversations also fit the statutory definition of "wire communication." The evidence at the suppression hearing

indicated that when a telephone call is made from a cordless telephone, the outgoing communications travel from the handset to the base unit via radio waves. From there, the communication travels through the telephone lines. Although no evidence was presented at the hearing regarding incoming communications, the same physical principles apply. See, generally, State v. McVeigh (1993), 224 Conn. 593, 598-599, 620 A.2d 133, 136. Namely, if a call is made to a home serviced by a cordless telephone, and the cordless phone is used to receive the call, the incoming message travels through the telephone lines to the cordless telephone base unit. From the base unit, the incoming message is transmitted to the handset via radio waves. Thus, incoming and outgoing communications on a cordless telephone are made, in part, through the use of the facilities for the transmission of communications through the aid of wires connecting the point of origin of the communication to the point of reception. Therefore, radio wave portions of cordless telephone communications are also "wire communications" as defined in R.C. 2933.51(A). Accord McVeigh, supra (Radio wave portions of cordless telephone communications are "wire communications" protected by Connecticut Wiretap Act.).

Further, there is no question that the Bidinosts' cordless telephone communications were "intercepted" by Maria Crippen. Again, the term "intercept" is defined as "the aural acquisition of the contents of any wire or oral communication through the use of an interception device." R.C. 2933.51(C). The contents of the Bidinosts' oral communications were "aurally" acquired through the use of the Crippens' electronic baby monitor. The monitor was indeed an "interception device," within the meaning of R.C. 2933.51(D), since the device was obviously capable of intercepting the Bidinosts' cordless telephone communications when used for that purpose.

Accordingly, we find that the purposeful interception of the Bidinosts' cordless telephone conversations was prohibited by the terms of R.C. 2933.52(A). Therefore, pursuant to R.C. 2933.63, the trial court was required to suppress the contents of the recorded communications. We hold that the provisions of R.C. 2933.52(A), prohibiting the purposeful interception of wire or oral communications through the use of an interception device, apply to cordless telephone communications that are intentionally intercepted and recorded.

We recognize, as did the court of appeals, that there exists a substantial body of case law from other jurisdictions holding that cordless and/or mobile telephone communications do not fit within the protections afforded by statutes prohibiting the interception of oral communications, since users of cordless or cellular telephones have no reasonable expectation of privacy in their telephone communications. See, e.g., Tyler v. Berodt (C.A.8, 1989), 877 F.2d 705; Edwards v. Bardwell (M.D.La.1986), 632 F.Supp. 584, affirmed (C.A.5, 1986), 808 F.2d 54; State v. Smith (1989), 149 Wis.2d 89, 438 N.W.2d 571; People v. Fata (Cty.Ct.1988), 139 Misc.2d 979, 529 N.Y.S.2d 683; and State v. Howard (1984), 235 Kan. 236, 679 P.2d 197. See, also, United States v. Hall (C.A.9, 1973), 488 F.2d 193; and State v. Delaurier (R.I. 1985), 488 A.2d 688. However, the above-cited cases address the protections afforded radio

telephone or cordless telephone communications in light of applicable federal and/or state statutory definitions of "oral communication," which differ from Ohio's statutory definition of that term.

For instance, the federal law prohibiting interception of oral communications defines an "oral communication," as one in which a person has a justifiable expectation that the communication is not subject to interception.  Section 2510(2), Title 18, U.S. Code.  Conversely, under Ohio's statutory scheme, the question whether users of cordless telephones have a reasonable expectation of privacy is not an issue that must be considered in determining whether a communication is an "oral communication," as defined in R.C. 2933.51(B).  R.C. 2933.51(B) is clear and unambiguous.  In Ohio, the terms of the statute defining "oral communication" clearly encompass cordless telephone conversations.  In any event, we seriously question the proposition that people communicating on cordless telephones have no legitimate expectation of privacy.8  Fundamental rights should not be sacrificed on the altar of advancing technology.

Similarly, we recognize that our determination today that cordless telephone communications are protected "wire communications" is contra to a number of decisions from other jurisdictions which have held that cordless telephone communications are not wire communications.  However, we are not persuaded to reach a similar conclusion under Ohio law.  In our judgment, Ohio's definition of "wire communication" is free from ambiguity and clearly encompasses cordless telephone communications.  Therefore, we are not at liberty to interpret Ohio's definition of "wire communication" as excluding cordless telephone communications.  Where, as here, a legislative enactment is free from ambiguity, we must apply, not interpret, the enactment.  See Cleveland Elec. Illum. Co. v. Cleveland (1988), 37 Ohio St.3d 50, 524 N.E.2d 441, paragraph three of the syllabus ("In matters of construction, it is the duty of this court to give effect to the words used, not to delete words used or to insert words not used."); Ohio Dental Hygienists Assn. v. Ohio State Dental Bd. (1986), 21 Ohio St.3d 21, 23, 21 OBR 282, 284, 487 N.E.2d 301, 303 ("Absent ambiguity, a statute is to be construed without resort to a process of statutory construction.").

Accordingly, we believe that the very terms of Ohio's statutory scheme prohibiting the purposeful interception of wire or oral communications mandate the conclusions we have reached in this case.  Further, we are unable to reconcile the state's arguments in this case with the arguments it advanced in State v. Larabee (1994), 69 Ohio St.3d 357, 632 N.E.2d 511.

In Larabee, Gerald Larabee recorded a number of cellular telephone calls he was able to overhear on a ham radio.  For this activity, Larabee was indicted for purposely intercepting oral communications in violation of R.C. 2933.52(A).  Larabee moved to dismiss the indictment.  The trial court granted the motion, finding that the indictment failed to state an offense under R.C. 2933.52(A).  Thereafter, the state appealed to the court of appeals, urging that the trial court had erred in dismissing the indictment. However, the court of appeals dismissed the matter without addressing the merits of the

state's appeal. Upon further appeal, this court remanded the cause to the court of appeals to address the merits whether Larabee had committed an indictable offense. Id. at 360, 632 N.E.2d at 513-514.

In Larabee, we did not discuss whether the matters alleged in the indictment constituted indictable offenses. However, both Larabee and the state of Ohio presented arguments before this court concerning that issue. Specifically, Larabee claimed that R.C. 2933.52 did not apply to his recording of the unscrambled cellular telephone radio transmissions. In a reply brief, the state made the following argument in response to Larabee's assertions:

"Ohio Revised Code Sections 2933.51 through 2933.66 were passed as a package effective March 25, 1987, to set forth a procedure whereby wire and oral communications could be intercepted and the terms upon which it could be done. Much detail is used in how the warrant can be obtained (2933.56 and 2933.57) and civil and criminal penalties for violating the same (2933.65).

"As previously set forth O.R.C. Section 2933.51 in defining oral communication defines it as 'any human speech that is used to communicate by one person to another person.' Obviously this would encompass a cellular telephone call since indeed it is human speech used to communicate between individuals. The Defendant [Larabee] did intercept conversations through the use of [an] interception device, to-wit his ICM AT 24 Hand Held Unit. Therefore by the very definition of the statute, Defendant's conduct fits the statute. It is obvious that a telephone call from one individual to another, is indeed an oral communication within the definition set out by O.R.C. Section 2933.51(B). It is also obvious that conversations initiated from a radio telephone logically fall within the category or oral communication. * * * Conversations aminating [sic, emanating] from a radio telephone should logically be treated in the same way as an oral communication. * * * A radio receiver does indeed fit the definition of interception devise [sic, device] since it is an electronic devise [sic] capable of interception of an oral communication when used for that purpose.

"The purpose of the Ohio General Assembly in enacting O.R.C. Sections 2933.51 et seq. was to protect the privacy of certain communications. It is clear that those individuals using cellular telephones expect their message only to be accepted, heard, and communicated with the other party with whom the call is made. * * *

"The Trial Court specifically dwelled upon the fact that the Federal Law included a category of 'electronic communications' which specifically includes cellular telephone calls and Ohio Law does not. The Court incorrectly reasoned that this meant that electronic communications were not covered under Ohio Law. * * *."

Therefore, in Larabee, the state urged that the provisions of R.C. 2933.51 and 2933.52 clearly and unambiguously prohibit the intentional interception of cellular and "radio" telephone communications, that there exists no room for any other interpretation of Ohio law, and that people who speak on these types of phones enjoy a reasonable expectation of privacy in

their telephone communications.  Conversely, in the case at bar, the state essentially urges that R.C. 2933.51 and 2933.52 do not mean what the statutes say, that this court should interpret Ohio law in accordance with federal laws on the subject, and that it would be absurd to conclude that there exists a reasonable expectation of privacy in cordless telephone communications.  Obviously, the state cannot have it both ways!

In the case at bar, the trial court clearly erred in failing to suppress the contents of the recorded telephone conversations. However, under the circumstances here, we find that the error was harmless beyond a reasonable doubt.

The state did not use the recorded telephone conversations during its case-in-chief.  Rather, the only time any recorded statement was used by the prosecution was during the cross-examination of appellant's father and sister.  Specifically, appellant's father was questioned concerning various statements he had made on the cordless telephone.  None of the recorded statements was particularly damning, especially when the statements were explained by him.  Further, in our judgment, the recorded statements did not significantly affect the credibility of appellant's father.  Appellant's sister was also questioned concerning statements that she had made on the cordless telephone.  While the cross-examination of appellant's sister may have had some impact on the jury's assessment of her credibility, we are convinced that the jury's ultimate findings were not adversely affected.

Hence, given the overwhelming evidence of appellant's guilt, we find, beyond a reasonable doubt, that the outcome of appellant's trial would not have been different had the state been precluded from using the contents of the recorded telephone conversations during the cross-examination of appellant's father and sister.  Thus, no reversible error occurred.  See Crim.R. 52(A).

In this proposition, appellant also contends that the recorded telephone communications should have been excluded on the basis that only one party to any given conversation could be overheard and, thus, there existed a "great possibility" that the jury would misinterpret the sum and substance of the conversations.  However, the appellant's father and sister were given the opportunity to explain their recorded statements and to describe the context in which the statements were made.  Further, we have already determined that the use of the recorded telephone conversations during the cross-examination of appellant's father and sister did not taint the outcome of appellant's trial.

As a final matter, we note that Maria Crippen was permitted to testify as a rebuttal witness for the prosecution with respect to one cordless telephone conversation she had overheard shortly after appellant's arrest.  According to Maria, appellant's sister was speaking with appellant and commented that appellant should consider plea bargaining.  This statement was overheard by Maria before she began recording the Bidinosts' telephone communications at the urging of the police and prosecutor.  In this regard, since the conversation was not recorded the oral communication was not purposely intercepted in violation of law.  Therefore, the contents of the

conversation were properly admitted for purposes of impeaching the testimony of a defense witness, appellant's sister, who denied making the statement.

Accordingly, we find no reversible error in the matters raised in appellant's third proposition of law.

IV

For the foregoing reasons, we affirm the judgment of the court of appeals.

Judgment affirmed.

Moyer, C.J., A.W. Sweeney, Wright, F.E. Sweeney and Pfeifer, JJ., concur.

Resnick, J., concurs in the syllabus and judgment only.


FOOTNOTES:
1    Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.
2    In general, the typical characteristic symptoms of post-traumatic stress disorder "involve reexperiencing the traumatic event, avoidance of stimuli associated with the event or numbing of general responsiveness, and increased arousal." American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (3 Ed. Rev. 1987) ("DSM-III-R") 247, Section 309.89.  In addition, a child may refuse to discuss the trauma and may also exhibit additional physical symptoms.  Id. at 249.
3    Evid.R. 702 was amended effective July 1, 1994.  As indicated by the Staff Notes, the amendment was to clarify circumstances in which expert testimony is admissible, but no substantive change from prior law was intended.  In any event, we believe that Timmons-Mitchell's testimony was clearly admissible under the former or current version of the rule. Currently, Evid.R. 702 provides:

"A witness may testify as an expert if all of the following apply:

"(A)  The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;

"(B)  The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;

"(C)  The witness' testimony is based on reliable scientific, technical, or other specialized information.  To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:

"(1)  The theory upon which the procedure, test or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;

"(2)  The design of the procedure, test, or experiment reliable implements the theory;

"(3)  The particular procedure, test, or experiment was conducted in a way that will yield an accurate result."
4    Evid.R. 403 provides:

"(A) Exclusion Mandatory.  Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

"(B) Exclusion Discretionary.  Although relevant, evidence may be excluded if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence."

5    Our conclusion that the trial court did not abuse its discretion in permitting Brazie to testify should not be construed as an approval of the discovery violation that occurred in this case.  Crim.R. 1(B) provides that the "* * * rules are intended to provide for the just determination of every criminal proceeding.  They shall be construed and applied to secure the fair, impartial, speedy, and sure administration of justice * * *."  Crim.R. 16 is no exception!  We are constrained to remind all who are involved with the use of Crim.R. 16 (and all the rules) that the rule is there to be applied and followed -- not in part but in whole.

6    R.C. 2933.63 provides:

"(A)  Any aggrieved person in any trial, hearing, or proceeding in or before any court, department, officer, agency, regulatory body, or other authority of this state or of any political subdivision of this state, other than a grand jury, may request the court by motion to suppress the contents, or any evidence derived from the contents, of any intercepted wire or oral communication for any of the following reasons:

"(1)  The communication was unlawfully intercepted;

"(2)  The interception warrant under which the communication was intercepted is insufficient on its face;

"(3)  The interception was not made in conformity with the interception warrant;

"(4)  The communications are of a privileged character and a special need for their interception is not shown or is inadequate as shown.

"(B)  Any motion filed pursuant to division (A) of this section shall be made before the trial, hearing, or proceeding at which the contents, or evidence derived from the contents, is to be used * * *[.]"

7    R.C. 2933.52(B) sets forth exceptions to the prohibitions contained in R.C. 2933.52(A).  For example, the prohibitions do not apply to the interception of wire or oral communications obtained through the use of an interception warrant.  See R.C. 2933.52(B)(1).

8    R.C. 2933.65 provides, in part:

"(A)  Any person whose wire or oral communications are intercepted, disclosed, or used in violation of sections 2933.51 to 2933.66 of the Revised Code shall have a civil cause of action against any person who intercepts, discloses, uses, or procures any other person to intercept, disclose, or use the communications and shall be entitled to recover any of the following from the person:

"(1)  Whichever of the following is greater:

"(a)  Liquidated damages computed at a rate of two hundred dollars per day for each day of violation, up to, but not exceeding an aggregate total of two thousand dollars;

"(b)  Actual damages.

"(2)  Punitive damages;

"(3)  Reasonable attorney's fees and other litigation expenses that are reasonably incurred in bringing the civil action.

"(B)  Good faith reliance on an interception warrant, or other court order, or oral approval for an interception is a complete defense to a civil action or criminal action that is brought under the laws of this state and that arises out of the execution of the warrant."

In our judgment, these provisions at least arguably (if not actually) constitute a legislative recognition that a right to privacy exists in Ohio with respect to wire and oral communications.