DECISION AND JOURNAL ENTRY
Following a trial by jury, Joshua "J" Burson was convicted of complicity to commit involuntary manslaughter with a firearm specification, in violation of R.C. 2903.01(B); complicity to commit kidnapping with a firearm specification, in violation of R.C. 2905.01(A)(2) or (3); complicity to commit aggravated robbery with a firearm specification, in violation of R.C. 2911.01(A); complicity to commit aggravated burglary with a firearm specification, in violation of R.C. 2911.11(A), and complicity to commit grand theft with a firearm specification, in violation of R.C. 2913.02. He has appealed from his convictions.
Burson has assigned as error that the trial court abused its discretion by (1) denying his request for a continuance and (2) refusing to require the State to provide written summaries of oral statements made shortly before trial by his co-defendants. He has also asserted that his trial counsel was ineffective because he did not move to suppress two statements that Burson made to the police.[1] All three assignments of error are overruled and the judgment of the trial court is affirmed.
 I
On October 7, 1998, Randal Liechty was killed by a shotgun blast to his head. The events of the evening, and those leading up to it, are generally undisputed. Jonathan Rohrer, who described himself as "a big brother" to Burson, was driving with Burson past Liechty's farm one day. As they passed it, he commented to Burson that, "I know a guy that lives there and that he I knew that he grew a lot of weed." Burson shared that information with his friends Marty Fisher and Brandon Knouse. Fairly soon, "Everybody knew about it." On October 5, some friends talked about meeting the next evening to go to the farm to steal some marijuana. On the evening of October 6, Sean Johns, Douglas Stroh, Ryan Gerber, Burson, and Knouse drove by Liechty's house in Johns' car. During the trip they discussed how to steal Liechty's marijuana. Hukill followed them in his father's van.
They returned to the small town of Justice, where they met up with Craig Simmons, and Mike Winland. Knouse went home. Burson, Simmons, Winland, Gerber, Stroh, Johns, and Hukill got into Hukill's father's van to ride out to the farm. Hukill was intoxicated. After a heated discussion, Hukill let Winland, and later Gerber, drive the van. On the way out to the farm, Hukill was "working the action" on a sawed off .12 gauge shotgun, and "holding it out the window trying to shoot it." Simmons had a .40 caliber pistol and Winland had a .380 pistol. Burson had his shotgun, which he let Stroh carry for part of the evening.
At some point, the plan changed from stealing marijuana from the field to going to the house to steal it. According to Simmons, Stroh and Johns organized the entrance into Liechty's house. Gerber stayed with the car. Stroh carried a walkie-talkie with him, so he could call for Gerber when the group needed to be picked up. Some of the group went in the front door. The remainder of the group, save Gerber, entered through the back door. They announced their arrival by shouting, "Sheriff's Department, search warrant, don't move." Hukill then ordered Liechty to lie down. Hukill stood over Liechty, holding the sawed off shotgun at his neck. The rest searched the house for marijuana. Burson searched the basement, along with Stroh, Johns, and Winland. They found a freezer that contained bags of marijuana and a grow-light system. After grabbing marijuana and taking down the lights, most of the group ran outside and Stroh called Gerber over the walkie-talkie. Simmons and Stroh went back into the house to get Hukill, who refused to leave until the van arrived. As the three were leaving the house, Simmons "heard the pop." Hukill uttered an obscenity, and ran out of the house. The van arrived, and the group got in the van and headed back to Justice, the town in which they had assembled a few hours earlier.
After speaking with John Rohrer, the police investigating Liechty's death came to believe that Burson was involved. On October 9th, 1998, Detective Brian L. Potts, of the Wayne County Sheriff's Office ("Sheriff's Office") went to Burson's home and spoke with Burson's father. Detective Potts told Burson's father that they were investigating a homicide in which his son may have been involved. Detective Potts asked whether Burson owned a firearm. After informing Detective Potts that Burson did own a gun, Burson's father took Detective Potts to Burson's room where Detective Potts recovered the .12 gauge shot gun, which Burson carried on October 6.
While Detective Potts was at his house, Burson came home. Detective Potts asked Burson to speak with him about Liechty's death. Burson agreed, but asked to talk with Detective Potts at home. After a jeep pulled up outside, Detective Potts expressed concern that "the other people involved in the incident" might see "the [police] car sitting out in front of [Burson's] house." According to Detective Potts, Burson agreed to accompany him to the Oaks Club parking lot, three or four miles away, for the interview. Before agreeing to go with the officers to the Oaks, Burson asked to be home by eight o'clock.
Lieutenant Gasser and Detective Chuhi brought Brandon Knouse, a witness, to the same location for an interview in their car. There was at least a third, and perhaps a fourth police vehicle at the Oaks, and a half dozen police officers in the Oaks Club parking lot while Knouse and Burson were being questioned there. During the interview, Burson offered to take Deputy Michael Maxwell, of the Sheriff's Office, to the Liechty's farm to show them where the marijuana plants were located. Several times during the interview Burson asked about getting home. According to Detective Potts, even though he asked about getting home, Burson agreed to continue when he was told that it was "only going to take a little bit longer." The written statement contained the initial question, "Do you understand your [sic] not under arrest[?]" Burson answered "Yes." Burson, himself, wrote the most of the first page of the statement.[2]
According to Detective Maxwell's estimate, the police dropped Burson off at home "eight-thirty maybe . . . twenty-after twenty-five-after-eight, maybe." When questioned further as to whether he knew "if it was close to eight o'clock or not?" he responded, "I know it was eight. I do know that." After talking with his girlfriend, Burson returned to Detective Potts' car and spoke with him again for five or ten minutes. During the second conversation he was "crying and upset." Detective Maxwell indicated that the information Burson gave to him on that evening was generally correct, except for Burson's denial that he went to the Liechty farm. In his initial statement, Burson gave names to the Sheriff's Office of other individuals who were involved in the homicide. Later interviews with those other individuals revealed that Burson's involvement was more extensive than he originally admitted.
Two days later Sergeant James Henry, of the Sheriff's Office was called to the Oaks Club to take Burson into custody. Stark County authorities had arrested Burson earlier. After advising Burson of his constitutional rights, Sergeant Henry transported Burson to the Wayne County Justice Center. Once they reached there, Burson agreed to make a written statement of his involvement with Liechty's death. During his questioning at the Justice Center, Burson asked, "Should I have an attorney?" Sergeant Henry testified that he responded that "it was up to him."
Burson's October eleventh statement consistently foreshadowed the trial testimony by his co-defendants.[3] Burson admitted that he found out about the marijuana from his friend John Rohrer and told his friends Fischer and Knouse. He also admitted that he participated in the trip to Liechty's to steal marijuana from the house, rather than the field. He also admitted that he, and the others, had contemplated Liechty's presence, and that he brought his gun at the request of one of the other individuals with whom he planned to steal marijuana. All of the individuals, including Burson, were aware that Hukill was acting recklessly with a sawed off shotgun. Burson also identified two other individuals who had guns that night. Burson indicated that, at one point during the evening, he saw Hukill standing over Liechty with a gun pointed at the back of his head.
On December 18, 1998, Burson moved to compel the State to disclose all statements obtained from the defendant and co-defendants, pursuant to Crim.R. 16(B)(1)(i) and (ii). Burson also requested that the court order the State to disclose "all agreements, in addition to the plea agreement already disclosed, between unindicted co-defendant Douglas Stroh and law enforcement," pursuant to Crim.R. 16(E)(3). A pretrial hearing on the motion to compel was set for January 4, 1999, but no transcript or summary of that hearing was made part of the record. On January 13, 1999, Burson moved for an evidentiary hearing for the purpose of determining the "nature and extent of any agreements that the unindicted co-defendant Douglas Stroh had with law enforcement agencies, either federal, state or local." A hearing was held on January 19, 1999, and the transcript of that hearing is part of the record.
On January 19, 1999, Burson moved for a continuance. The bases for the requested continuance were that (1) Burson received the electrostatic shoeprint lift analysis just twelve days before the trial, (2) that the State notified Burson only seventeen days before the trial that it might call the five indicted co-defendants as witnesses, and (3) Burson had not yet received a copy of the written agreement between Stroh, an unindicted co-defendant, and law enforcement. Burson asserted that the continuance was necessary because the copy of the written agreement was essential to the defense of entrapment, which might be raised at trial. In the alternative, Burson requested the exclusion of the shoeprint analysis and the testimony of the indicted co-defendants at trial.
The trial court held an evidentiary hearing to determine what agreements, if any, Stroh had with any law enforcement agencies, and to determine whether those agreements had any relation to the case against Burson. Stroh was involved in trafficking in LSD in August 1998. Following his arrest on LSD charges, Stroh agreed to provide information to the Massillon Police Department and to the DEA about "where the LSD was coming from." He also told Detective McPherson, of the Massillon Police Department, on one occasion that "there was some guy growing weed [on a Holmes County farm] and they ought to go check it out." In exchange, Stroh understood that he "would not get mandatory time" and that he "wasn't going to jail at all." According to Stroh, the agreement was verbal. He testified that he signed a paper agreeing that he "couldn't accept any money, that [he] couldn't have any contact with this person * * * where the LSD was coming from other than with an officer with [him]." He denied receiving a copy of the document he signed. Stroh denied having any dealings with the Stark County Sheriff's Department. Captain Ricky Perez, of the Stark County Sheriff's Department denied any (1) contact, (2) informant or agent agreement, or (3) knowledge of any informant or agent agreement with Stroh.
 II Denial of Continuance
The Supreme Court of Ohio has held that "[t]he grant or denial of a continuance is a matter that is entrusted to the broad, sound discretion of the trial judge." State v. Unger
(1981), 67 Ohio St.2d 65, syllabus. In making that decision, the trial court must weigh all competing considerations. Id. at 67-69. The trial court must balance "[a]ny potential prejudice to the defendant [against the] court's right to control its own docket and the public's interest in the prompt and efficient dispatch of justice." Id. at 67. When reviewing a decision that has been entrusted to the discretion of the trial court an appellate court may not substitute its judgment for that of the trial court. State v. Finnerty (1989), 45 Ohio St.3d 104, 107-08. Rather, an assignment of error premised upon the denial of a continuance may be sustained only when that denial constitutes an abuse of the trial court's discretion. Unger,67 Ohio St.2d at 67. Abuse of discretion is "more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." State v. Adams (1980), 62 Ohio St.2d 151,157-158.
In order to assert successfully the affirmative defense of entrapment, an individual must show, by a preponderance of the evidence, that the criminal design originated with government officials, who implanted the disposition to commit the alleged offense in the mind of an innocent person. State v. Doran (1983),5 Ohio St.3d 187, paragraph one of the syllabus. Evidence relevant to the predisposition of the individual to commit the crime should be freely admitted. Id. at 192. Relevant evidence would include evidence tending to establish:
 (1) the accused's previous involvement in criminal activity of the nature charged, (2) the accused's ready acquiescence to the inducements offered by the police, (3) the accused's expert knowledge in the area of the criminal activity charged, (4) the accused's ready access to contraband, and (5) the accused's willingness to involve himself in criminal activity.
Id. at 192. As a general rule, evidence of other crimes or wrongs is not admissible to establish that, on a particular occasion the accused acted in conformity with his generally poor character. Evid.R. 404(B). Specific instances of conduct are admissible, however, to establish a character or a trait of character when that character or trait of character of the accused is an essential element of a charge, claim, or defense. An innocent mind is an essential element of the defense of entrapment. See Doran,5 Ohio St.3d at 192, United States v. Russell (1973), 411 U.S. 423, 433,36 L.Ed.2d 366, 374. Specific instances of conduct that Doran
suggests should be freely admissible to establish the character trait of an innocent mind would include, as related to this case, conduct tending to establish prior involvement in similar criminal activity, access to contraband, and willingness to be involved in criminal activity. See Doran,5 Ohio St.3d at 192.
Burson requested a continuance from the trial court on three bases, but brought only one to the attention of this court. Specifically, Burson has asserted that the trial court abused its discretion by denying him a continuance so that he could obtain copies of any agreement Stroh had with the DEA. Burson has argued that he needed the information regarding Stroh's "involvement with law enforcement, particularly the DEA, * * * to aid in preparation of his defense especially regarding any potential affirmative defense of entrapment." Burson did not suggest any other specific prejudice that might have resulted as a consequence of the denial of his request for a continuance.
Even if the trial court had granted a continuance, and Burson was able to determine that the plan for an armed entrance into Liechty's house for the purpose of stealing marijuana originated with government officials[4], it is unlikely that Burson would have been able to establish that he was not predisposed to commit the crimes. From the evidence admitted at trial, it is undisputed that Burson provided the information about Liechty's marijuana crop to the individuals who ultimately killed Liechty. He had access to contraband. Burson had gone to the field with friends to steal marijuana from Liechty on two or three occasions before the evening on which Liechty was shot. This could have been used to establish Burson's willingness to be involved in criminal activity. The trial court did not admit evidence of Burson's prior conviction for receiving stolen property or of his juvenile adjudications. Had Burson raised the defense of entrapment, however, those specific instances of conduct might have been admissible to establish that his was not an innocent mind. Burson was convicted of three theft offenses. R.C. 2913.01(K)(1). Burson's prior conviction for receiving stolen property was also for a theft offense. Id. The nature of his juvenile adjudications is not known, but it is possible that, if connected to drug use or theft, they would also have been admissible. At a minimum, Burson's prior conviction could have demonstrated his previous involvement in criminal activity of the nature charged.
It is unlikely, given the evidence admitted and potentially admissible, that Burson could have established by a preponderance of the evidence that he had an innocent mind. Because an innocent mind is an element of the defense of entrapment, if Burson lacked an innocent mind he could not have been entrapped.
To determine whether the trial court abused its wide discretion to grant or deny continuances, we weigh the risk of prejudice to the parties to see if it outweighs the right of a court to manage its own docket and the public's interest in prompt and efficient justice. Here, the risk of the prejudice articulated was slim. The trial court held an evidentiary hearing on the matters of concern to Burson. There was no evidence presented during that hearing that would have tended to establish that any government entity intended to induce the commission of an armed entrance to the Liechty farm for the purpose of stealing marijuana. Even if Burson would have been able to establish that the government set out to entrap him, it is extremely unlikely that Burson could have established that he was an unwary innocent.
The trial court decision to deny Burson's motion for a continuance to permit him to obtain documents which might help him establish an almost certainly unsuccessful defense was not unreasonable, arbitrary or unconscionable. Burson's first assignment of error is overruled.
Written Summaries of Oral Statements
Crim.R. 16(B)(1)(a) requires that, "[u]pon motion of the defendant, the court shall order the prosecuting attorney to permit the defendant to inspect and copy or photograph any of the following which * * * is known * * * to the prosecuting attorney * * * (ii) [w]ritten summaries of any oral statement, or copies thereof, made by the defendant or co-defendant to a prosecuting attorney or any law enforcement officer."
If it is brought to the attention of the trial court that a party has failed to comply with discovery, the court is given discretion to impose appropriate sanctions for discovery violations. Crim.R. 16(E)(3). It may "order such a party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances." Id.
Burson received copies of the initial statements of his co-defendants. In the last few days before trial, the State reached a plea agreement with one co-defendant. On the day before, or the day of, trial the State reached plea agreements with three other co-defendants. After the plea agreements were reached, the prosecuting attorney interviewed each co-defendant as part of his witness preparation. As each witness took the stand, Burson requested that the court require the State to provide him with written summaries of the State's post-plea agreement interviews with his co-defendants. He did not request a continuance, or suggest any other remedy. The trial court declined to require the State to summarize the last minute interviews it had conducted with the co-defendants.
When an error is asserted on appeal, the record must demonstrate not only that error intervened, but that prejudice to the appellant resulted from the error. Smith v. Flesher (1967),12 Ohio St.2d 107, paragraph one of the syllabus. Burson's sole suggestion of prejudice from the asserted error was that "statements made by the co-defendants might have been used by Mr. Burson as evidence to introduce to the jury regarding the weight and credibility of the testimony given by the co-defendants." The testimony of each co-defendant was consistent with the testimony of every other co-defendant in all material aspects. Burson has not contended that the content of the testimony of any of his co-defendants was a surprise, or differed in any way from the statements he had been given earlier. The cumulative testimony of his co-defendants is consistent with his own statement. Burson has not directed our attention to any portion of the record that would demonstrate that access to a written summary of the interviews with his co-defendants would have provided him with any evidence that he could have used to diminish the weight and credibility of the testimony of his co-defendants.
Assuming, for the sake of argument, that the State was required to summarize in writing the interviews with Johns, Simmons, Gerber, and to provide the summaries to Burson,[5] he has not demonstrated that the trial court's refusal to order the particular sanction he requested was an abuse of discretion. Nor has he demonstrated that he was prejudiced by the court's refusal to order that the interviews be reduced to writing and provided to him during the trial.
Because Burson did not demonstrate prejudice, this court will not disturb the judgment of the trial court, whether or not the actions of either the State or the trial court were improper. Burson's second assignment of error is overruled.
Ineffective Assistance of Counsel
Burson has asserted that he is entitled to a new trial because his counsel was ineffective. To establish that trial counsel was so ineffective that Burson was denied his right to counsel, and is entitled to a new trial because of it, he must demonstrate deficient performance and prejudice resulting from that deficient performance. Strickland v. Washington (1984),466 U.S. 668, 687, 80 L.Ed.2d 674, 693. The prejudice must reach such a level that it is reasonably probable that the professionally unreasonable performance caused him to lose what he otherwise would have won. United States v. Morrow (C.A.6 1992),977 F.2d 222, 229, certiorari denied (1993), 508 U.S. 975, 125 L.Ed.2d 668.
Burson has asserted that his counsel was ineffective solely because he did not move to suppress two statements Burson made to police. The consequence of his counsel's failure to request suppression was that "his written statement of October 9, 1998 as well as related testimony, was improperly and impermissibly admitted at his subsequent trial" and that the "subsequent use [of both statements] at trial implicated a violation of certain of Mr. Burson's constitutional rights." According to Burson, if "the credibility or accuracy of the testimony of the co-defendants could have been successfully attacked, the absence of Mr. Burson's involuntary statements could have reduced the quantum of probative evidence dramatically. So dramatically that some, if not all, of the charges would have been brought into question."
We assume, for the sake of argument, that the performance of Burson's counsel was deficient because he did not move to suppress Burson's statements and that, had such a motion been filed, it would have succeeded.[6] Burson must still demonstrate that he was actually prejudiced by the admission of the allegedly excludable statements.[7] Four co-defendants testified at Burson's trial. Each testified consistently with the others in all material aspects.[8] Nothing in Burson's statements contradicted the testimony of his co-defendants in any material aspect. Burson's statements did not contain any information that was material to the jury's determination of his guilt or innocence, beyond the information it had already heard through the testimony of his co-defendants. The jury heard four recitations of an essentially an undisputed version of the events on October 6, 1998, from Burson's co-defendants. Because of this, their task was to determine whether Burson's undisputed actions constituted the crimes with which he was charged, based on the elements articulated to it by the court. It is not reasonably probable that, in the absence of a Burson's virtually identical recitation of the same events, the jury would have reached a different conclusion.
Burson's third assignment of error is overruled.
 III
Burson's first assignment of error is overruled because the trial court did not abuse its discretion when, after holding an evidentiary hearing, it denied Burson's request for a continuance so that he could acquire information that had almost no likelihood of assisting in his defense. Because Burson has not established that the trial court's refusal to order the State to reduce its pre-trial interviews with Burson's co-defendants to writing resulted in prejudice, his second assignment of error is overruled. Burson's third assignment of error is overruled because it is not reasonably probable that he would have escaped conviction for any of the offenses he was convicted of committing, even if his trial counsel had sought and obtained suppression of his statements. The judgment of the trial court is affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellant.
Exceptions.
 ___________________________ WILLIAM R. BAIRD
SLABY, J., CARR, J., CONCUR.
[1] Burson assigned this as his first assignment of error, but his argument depends, in part, on the success of his other two arguments. Because of this, we discuss his first assignment of error last.
[2] The statement was in question and answer format. On the first page, there are three questions. The answer to each of the first two questions is "Yes." The second "Yes" was followed by a fourteen line narrative about Burson's first encounter with Hukill on Monday or Tuesday evening. Thereafter, one or the other officers wrote both the questions and answers. Each answer is initialed "JB" and each page is signed "Josh J. Burson."
[3] The summary of events leading up to Liechty's death is taken from the trial testimony of co-defendants Craig Simmons, Sean Johns, Ryan Gerber, and Michael Winland.
[4] It is unlikely that even with a continuance Burson would have been able to establish this. From the evidentiary hearing, summarized supra at, it appears that the only agreement Stroh had with law enforcement was related to LSD trafficking. The record contains no evidence that Stroh's mention of the Liechty marijuana crop was of more than passing interest to the law enforcement authorities with whom he spoke.
[5] The Supreme Court of Ohio has said that the State must summarize the oral statement of a defendant or co-defendant in writing for the purposes of disclosure pursuant to Crim.R. 16(B)(1)(a). State v. Bidnost (1994), 71 Ohio St.3d 449, 456. The parameters of what constitutes a statement are apparently not well defined. It is clear that not every utterance constitutes a statement. In State v. Scudder (1994), 71 Ohio St.3d 263, 271, certiorari denied (1995), 515 U.S. 1164, 132 L.Ed.2d 864, the Supreme Court of Ohio observed that it assumed that "the trial court was perfectly capable of determining what constitutes a witness's `statement'" when the trial court determined that the summary of an interview with a witness was not a statement within the meaning of Crim.R. 16(B)(1)(g). See, generally, State v. Doe
(1993), 89 Ohio App.3d 475, 478-479, determining that comments made to an undercover officer during a drug transaction are not "statements" within the meaning of Crim.R. 16(B)(1)(a). It does not appear that an appellate court has yet considered whether a prosecutorial interview with a defendant or co-defendant during final preparation for trial is a statement that is subject to disclosure pursuant to Crim.R. 16(B)(1)(a). Because it is not determinative here, we also decline to address it.
[6] It is unlikely that a motion to suppress either of Burson's statements would have been successful. The record, summarized in relevant part supra at ___, contains nothing to contradict the State's contention that the first interview was voluntary. The police initially met with Burson in the presence of at least one parent. In the presence of that parent, after explaining that Burson might have been involved in a homicide, Burson agreed to accompany police to another site to talk with him about it. The reasons the State gave for questioning him elsewhere were reasonable. There were several individuals involved and police did not want any of them spooked by the presence of a police car outside Burson's home. Although the police did not return Burson home at precisely the time he requested, the record indicates that he voluntarily stayed with them longer. Burson, in his own handwriting, agreed that he was not under arrest at the time of the interview. With respect to the second interview, Burson was under arrest and had been given his Miranda warnings. He inquired as to whether he should have an attorney or not, and was told it was up to him. That query is too ambiguous to require that the police terminate questioning. See Davis v. United States (1994),512 U.S. 452, 455 and 459, 129 L.Ed.2d 362, 369 and 371.
[7] Burson has not identified any "related testimony" that he believes should have been excluded in connection with his statements, so we consider only the effect of excluding the two statements made by Burson.
[8] Their testimony differed only in minor details, such as which individuals entered Liechty's house through which of the two doors and the order in which the individuals were picked up by the van after they left the house. Although each individual did not testify to every event, none disputed that: (1) Burson was the initial source of the information about Liechty's marijuana crop; (2) Burson had made a few trips to the farm to steal marijuana before October 6, 1998; (3) Burson, along with others, went to Liechty's residence earlier on the fatal evening; (4) some of the planning for attack occurred during the initial trip; (5) the group went to Liechty's a second time that night with the intent of stealing marijuana from his house; (6) they contemplated his presence, as indicated by their plan of entrance; (7) several members of the group carried guns; (8) Burson carried a gun during at least part of the evening; (9) Hukill was intoxicated and acting recklessly; (8) Burson and the rest of the group were aware of Hukill's intoxication; (10) Hukill held Liechty at gunpoint while the others gathered his marijuana; (11) Hukill shot and killed Liechty.