OPINION
{¶ 1} Defendant-appellant Jeffrey Bowshier appeals from his conviction and sentence for trafficking in drugs and drug abuse. The conviction includes a major drug offender specification. Bowshier was sentenced to ten years in prison for trafficking, ten years for the major drug offender specification, and five years each on two counts of drug abuse. The trial court imposed maximum and consecutive sentences, which *Page 2 
resulted in a total aggregate sentence of thirty years in prison.
 {¶ 2} Bowshier contends that the trial court erred in rulings made regarding a drug possession lab report, in failing to allow Bowshier the right to counsel, and in instructing the jury. Bowshier also contends that the jury verdict is against the manifest weight of the evidence. Finally, Bowshier claims that he was prejudiced by prosecutorial misconduct committed throughout the trial.
 {¶ 3} We conclude that the trial court erred in failing to allow a continuance as a remedy for the State's discovery violations. We further find that Bowshier's conviction on one drug abuse charge is against the manifest weight of the evidence — the evidence does not establish that Bowshier was even in constructive possession of a substantial amount of the drugs forming the basis for that count of the indictment. Finally, we conclude that the trial court abused its discretion when it refused to include a jury instruction on entrapment. Accordingly, the judgment of the trial court is Reversed, and this cause is Remanded for further proceedings.
 I {¶ 4} In September, 2005, Detective Gerald Woodruff of the Springfield, Ohio, Police Department received a call from Scott Snook, who wanted to cooperate with the narcotics unit in connection with alleged illegal activity on the part of Jeffrey Bowshier. Based on information from Snook, Woodruff contacted Task Force Officer Jorge Del Rio. Del Rio was a Dayton police officer who had been assigned to the Dayton Drug Enforcement Administration (D.E.A.) office.
 {¶ 5} On October 3, 2005, a plan was devised, in which Del Rio would pose as *Page 3 
an out-of-state trafficker named "Jorge." Del Rio was to contact Bowshier and say that he was coming through Ohio and would deliver a load of marijuana. The price was to be $800 per pound and "Jorge" would deal only with 200 pounds or more at a time. Del Rio was also to say that he would accept $40,000 in cash and two kilos of cocaine as a down payment, with the remaining balance to be paid upon the next delivery.
 {¶ 6} On October 10, 2005, Del Rio, Snook, and Woodruff met at the Dayton D.E.A. office, and Snook provided telephone numbers for Bowshier. Del Rio then called Bowshier to set up a meeting. Subsequently, on October 14, 2005, Del Rio and Bowshier met in the parking lot of a Sam's Club. At the meeting, Del Rio showed Bowshier 200 pounds of "flash marijuana," which is D.E.A. marijuana earmarked solely for undercover operations. Del Rio asked Bowshier what "Snooky" had told him that "Jorge" could do. Bowshier reported that Snooky had said "$40,000 and two kilos."[1] Bowshier told Del Rio that he was not in a position to do the deal. Bowshier said he had the cocaine and $20,000, but could not come up with $40,000. Bowshier offered two vehicle titles instead. Del Rio told Bowshier that he would call in a few weeks to see how things were coming together.
 {¶ 7} Del Rio called Bowshier at the end of October, and Bowshier again said he did not have the money. Del Rio called twice in the early part of November, making concessions because Bowshier said he did not have enough money. Eventually, Del Rio agreed to take $20,000, two kilos of cocaine, and two car titles as a down payment *Page 4 
in exchange for the 200 pounds of marijuana.
 {¶ 8} The exchange date was set for November 17, 2005. On that day, the police staked out Bowshier's house and the parking lot of a Days Inn Motel, where the exchange was to take place. The officers monitoring the house saw Bowshier drive up shortly before the exchange and exit his vehicle, empty-handed. Bowshier ran into the house and emerged about five minutes later with a plastic grocery bag. He then drove to the Days Inn, where he met Del Rio in the parking lot. By pre-arrangement, the marijuana was located in the back of a small U-Haul truck. Bowshier was supposed to drive the truck away and return it to the parking lot after disposing of the marijuana. However, the police had disabled the battery so that the truck would not start.
 {¶ 9} When Bowshier pulled into the lot, he gave Del Rio the plastic bag with the money, what looked like two kilos of cocaine, and the vehicle titles. Del Rio then opened up the back of the truck and showed Bowshier the marijuana. Bowshier complained that it looked a little "seedy." Del Rio apologized and said it was the best he could get at the time. Del Rio promised to make it up on the next trip.
 {¶ 10} After Bowshier got into the driver's seat of the U-Haul, Del Rio gave the S.W.A.T. team the signal to arrest, and Bowshier was arrested. In the meantime, the police had continued to monitor Bowshier's home. A search warrant was obtained, and the police recovered several suspected drug-related items, including a black duffel bag containing baggies and suspected marijuana and cocaine. In addition, the police found suspected cocaine in a purse in a closet, and in a bedroom occupied by an adult woman named Jessica Jakes. The cocaine in the bedroom was not otherwise connected to Bowshier. *Page 5 
 {¶ 11} Following his arrest, Bowshier was indicted on six counts, including two counts of drug trafficking and four counts of drug abuse. One count of trafficking and one count of drug abuse were dismissed before trial. Bowshier was convicted on the remaining counts, and sentenced accordingly. Bowshier appeals from his conviction and sentence.
 II {¶ 12} Bowshier's First Assignment of Error is as follows:
 {¶ 13} "THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION WITH RESPECT TO THE RULINGS MADE REGARDING THE DRUG POSSESSION LAB REPORT."
 {¶ 14} Under this assignment of error, Bowshier contends that the trial court should have excluded a laboratory report and expert testimony about the report because the State failed to timely produce the report. The State claims that the report was likely furnished in a timely manner, and that the trial court appropriately exercised its discretion in admitting both the report and expert testimony about it.
 {¶ 15} Crim. R. 16 requires the prosecution and defense to disclose evidence to each other, and allows the court to impose sanctions for a failure to do so, including an order permitting discovery or inspection, an order granting a continuance, an order prohibiting the party from introducing in evidence the material that was not disclosed, or any other order the court deems just under the circumstances. Crim. R. 16(E)(3). "A continuance, upon proper motion, is a favored method to avoid prejudice which may flow from a failure to provide discovery yet ensure that the charges against an accused *Page 6 
are tried timely and fairly." State v. Parks (1990), 69 Ohio App.3d 150,155, 590 N.E.2d 300 (citations omitted).
 {¶ 16} In deciding whether a trial court has abused its discretion by failing to order a continuance following the State's non-disclosure of evidence, we have applied the following three-part test, which inquires:
 {¶ 17} "(1) [W]hether the prosecution's failure was a willful violation of Crim. R. 16, (2) whether foreknowledge of the evidence would have benefitted the accused in the preparation of his defense, and (3) whether the accused was prejudiced by the evidence concerned."69 Ohio App.3d at 155-156, citing State v. Parson (1983), 6 Ohio St.3d 442,453 N.E.2d 689 and State v. Finnerty (1989), 45 Ohio St.3d 104,543 N.E.2d 1233.
 {¶ 18} Although we phrased this test in the conjunctive inParks, the test is disjunctive. In Parson, the Ohio Supreme Court stated that:
 {¶ 19} "Where, in a criminal trial, the prosecution fails to comply with Crim. R. 16(B)(1)(a)(ii) by informing the accused of an oral statement made by a co-defendant to a law enforcement officer, and the record does not demonstrate (1) that the prosecution's failure to disclose was a willful violation of Crim. R. 16, (2) that foreknowledge of the statement would have benefitted the accused in the preparation of his defense, or (3) that the accused was prejudiced by admission of the statement, the trial court does not abuse its discretion under Crim. R. 16(E)(3) by permitting such evidence to be admitted." Parson,6 Ohio St.3d 442, at syllabus (emphasis added).
 {¶ 20} In State v. Hall, Cuyahoga App. No. 83361, 2004-Ohio-5963, the Eighth District Court of Appeals noted that although Parson phrased the test in the disjunctive, one Ohio Supreme Court case afterParson used a conjunctive standard. Id. at ¶ 18, *Page 7 
discussing State v. Joseph, 73 Ohio St.3d 450, 1995-Ohio-288,653 N.E.2d 285. The Eighth District concluded in Hall that a defendant would not be required to satisfy all three criteria before being entitled to obtain relief for a discovery violation. In rejecting a "conjunctive" approach, the Eighth District noted that Ohio Supreme Court cases before and afterJoseph employed Parson's disjunctive approach. 2004-Ohio-5963 at ¶ 22. The Eighth District also stressed that:
 {¶ 21} "It is unlikely that a conjunctive standard would satisfy the constitutional concerns outlined in Brady, supra, because due process questions concerning suppressed evidence are decided `irrespective of the good faith or bad faith of the prosecution.' * * * It would make no sense to require a defendant to show intentional misconduct in order to obtain relief during trial, when suppressed evidence discovered after trial is not subject to such a standard. As in Brady, due process requires that the Crim. R. 16(E)(3) standard provide the relief necessary to ensure fairness, * * * regardless of whether the discovery violation was intentional. Therefore, we believe the judge properly determined that a discovery violation occurred, despite the fact that * * * [the defendant] could not show the violation was intentional. Litigants and judges in future cases should approach Joseph, and other cases citing a conjunctive Parson standard, with caution." Id. at ¶ 21, citing Brady v. Maryland (1963), 373 U.S. 83, 87, 83 S.Ct. 1194,10 L.Ed.2d 215 (footnotes omitted).
 {¶ 22} We agree with the Eighth District on this point. Even if a discovery violation is unintentional, a judgment should not be affirmed where the aggrieved party has been prejudiced by the other side's failure to disclose relevant evidence. Furthermore, in an opinion issued after Parks, and concurred in by the author of Parks, *Page 8 
we noted that:
 {¶ 23} "We read Parson to mean that a trial court abuses its discretion by failing to exclude evidence where the defense is able to show prejudice or would benefit from foreknowledge of the statement, or where there has been a willful violation of Crim. R. 16 by the prosecution." State v. Wilson (1993), 91 Ohio App.3d 611, 615,632 N.E.2d 1384.
 {¶ 24} Accordingly, we will apply the test in the disjunctive. In this regard, we note that the indictment was filed on December 15, 2005, and Bowshier filed a demand for discovery, including the results of any scientific tests, on December 19, 2005. In mid-January, 2006, Bowshier filed a motion to compel, contending that he had not received any discovery. The trial court waited nearly a month, or until February 9, 2006, to rule on the motion. In a two-line entry, the trial court ordered the State to comply with the discovery requests forthwith or be subject to sanctions.
 {¶ 25} Bowshier also filed a motion to suppress in early February, 2006. On March 22, 2006, the court overruled the suppression motion. In the same entry, and on its own motion, the court continued the trial that had been set for March 21, 2006, due to the fact that discovery had not been completed. The court ordered the State to turn over all remaining discovery by 5:00 p.m. on March 21, 2006. In the same entry, the court set a new trial date for less than one week later (March 27, 2006).
 {¶ 26} Bowshier's attorney promptly filed a motion for continuance, contending that one week was not enough time to prepare for trial on first degree felonies. Bowshier's attorney also pointed out that he had two jury trials set for March 29, 2006, and had other court appearances scheduled for the same week. These appearances *Page 9 
had been set well in advance of the current trial date. And finally, Bowshier's attorney noted that the State had failed to follow the court's prior order on discovery and had failed, without excuse, to turn over thirteen tapes to the defense until March 21, 2006-only five days before the scheduled trial. As a result, Bowshier's attorney claimed he would not have time to adequately prepare for trial.
 {¶ 27} The trial court overruled the motion for continuance on March 23, 2006, finding that counsel had already had three months to prepare, given that the arraignment had been held on December, 19, 2006. The court also dismissed the issue of the other scheduled jury trials, based on the court's opinion (later proven incorrect) that the trial in the current case would last only one and a half days. Finally, the court rejected the discovery issue, because the court believed that the tapes could be reviewed in a few hours.
 {¶ 28} Trial then began, as scheduled, less than a week later. After the jury was empaneled, Bowshier's attorney told the court that he had just learned that the State had a lab report that had not been disclosed to the defense. The report was dated December 5, 2005, and analyzed the drugs referred to in counts 1, 2, 5, and 6 of the indictment.
 {¶ 29} The State had previously given defense counsel one lab report dated October 6, 2005. This report analyzed drugs mentioned in count 4 of the indictment, which involved trafficking in powder cocaine in excess of 25 grams on October 5, 2005. The report that had not been disclosed dealt with trafficking and possession of powder cocaine and marijuana on a different date — November 17, 2005 — which was the date of the proposed drug exchange at Days Inn. *Page 10 
 {¶ 30} The prosecutor explained to the trial court that his practice was not to indict cases until he had a lab report detailing the case, which in this situation was one week after the December 5, 2005 lab report was issued. The prosecutor further stated that his practice was to photocopy his entire file and pass it on to the defense. Accordingly, the prosecutor believed the December lab report had been sent. The prosecutor stated that if the report had not been given to defense counsel, it was made available as soon as the prosecuotor became aware of it (after the jury had been empaneled).
 {¶ 31} The trial court found that the lab report should have been disclosed to defense counsel, but had been omitted from the discovery packet. The court did not make a finding on willfulness. Willful conduct is said to involve "`intent, purpose or design to injure.'" McKinney v.Hartz Restle Realtors, Inc. (1987), 31 Ohio St.3d 244, 246,510 N.E.2d 386. It has also been defined as an "`intentional deviation from a clear duty or from a definite rule of conduct, a deliberate purpose not to discharge some duty necessary to safety, or purposely doing some wrongful acts with knowledge or appreciation of the likelihood of resulting injury.'" Whitfield v. Dayton, 167 Ohio App.3d 172, 181,2006-Ohio-2917, 854 N.E.2d 532, at ¶ 30.
 {¶ 32} Under this definition of willfulness, we cannot say that the State's actions were willful. The issue is not completely free from doubt, however, in view of the fact that the State had already been ordered on two separate occasions to disclose evidence.
 {¶ 33} Because Bowshier was charged with possession of drugs and trafficking in drugs, the defense would have benefitted from foreknowledge of the laboratory report, *Page 11 
which outlined both the weight and identity of the drugs that were found. The State argues that this information is irrelevant because Bowshier relied on an entrapment defense. However, this argument is based on hindsight. At the time the evidence was disclosed, the defendant had not advanced any "theories" of its case, which presumably are determined in response to the evidence identified in discovery. If a defendant in a drug case perceives a weakness in the evidence relied upon by the State to prove the weight and identity of the drugs, he may well choose to defend upon that ground — the State's failure to prove his guilt beyond a reasonable doubt — in preference to a weak entrapment defense, if he deems the two defenses to be mutually exclusive as a practical matter (see discussion below, at pp. 15-16).[2] Furthermore, the evidence was critical, at least to the cocaine possession and trafficking charges, because the State could not have proven the matter without scientific evidence. The defense was prejudiced because it did not have the ability to meaningfully contest the expert testimony.
 {¶ 34} Defense counsel asked the court to grant a mistrial or to grant a continuance, so that the defense could allow its own expert to review the lab report and review the substances. The trial court refused to grant a continuance, contending that the police report put the defendant on sufficient notice of the amounts of powder cocaine involved and that the substance was, in fact, cocaine.
 {¶ 35} We have said on numerous occasions that the preferred remedy for discovery violations is to grant a defendant's motion for continuance. See, e.g., State v. *Page 12 Mabry, Montgomery App. No. 21569, 2007-Ohio-1895, at ¶ 45-46;Parks, 69 Ohio App.3d at 155; and State v. Hirtzinger (1997),124 Ohio App.3d 40, 48, 705 N.E.2d 395.
 {¶ 36} The trial court did indicate that it would grant a "continuance" to the extent of allowing defense counsel to speak to the expert who had conducted the lab tests. The court also said it would consider the matter further after counsel spoke to the expert if something surfaced during the conversation. Subsequently, when the expert (a forensic criminalist with the Springfield Police Department Crime Laboratory) testified, defense counsel again objected to the testimony. When the court offered time for counsel to ask questions outside the jury, counsel stated that there would be no purpose, since the questions would go to the issue of whether the substances were controlled substances, and the expert was obviously going to testify that they were controlled substances. Counsel renewed his request for a continuance, but the court overruled the objection and admitted both the lab report and the expert's testimony.
 {¶ 37} In Hirtzinger, we found no abuse of discretion in the admission of evidence that had been withheld because the defense asked for total exclusion of the evidence rather than requesting a continuance.124 Ohio App.3d at 48. In contrast, the defense in the present case requested the less onerous sanction of continuing the trial to allow examination of the material by an expert retained by the defense. In rejecting the request, the trial court did not even inquire as to how quickly this could have been accomplished. Admittedly, the jury was already empaneled when the evidence was first disclosed, but that was not the fault of the defense.
 {¶ 38} "Effective representation generally requires more than an interview in a courthouse hallway." Wilson (1993),91 Ohio App.3d at 616-617. In State v. Bidinost, *Page 13 71 Ohio St.3d 449, 1994-Ohio-465, 644 N.E.2d 318, the Ohio Supreme Court stressed that it had specifically drafted the criminal rules of discovery to "ensure the fairness of criminal proceedings."71 Ohio St.3d at 456. The court also noted that trial courts have discretion in selecting appropriate sanctions for discovery violations. Id. However, discretion to select a sanction is different from imposing no sanction at all.
 {¶ 39} In the present case, the trial court also commented that a laboratory report and forensic analysis are required for proof beyond a reasonable doubt, but that the indictment and police reports put Bowshier on notice, for purposes of due process, of the amount of cocaine and that the substance was, in fact, cocaine. Bowshier disagrees, contending that R.C. 2925.51 makes disclosure of the report mandatory.
 {¶ 40} R.C. 2925.51(A) accords prima-facie evidentiary weight to laboratory reports on the content, identity, and weight or the existence and number of unit dosages of allegedly illegal substances. The statute requires certain statements to be attached to the report, verifying the identity and credentials of the signer of the report, as well as the fact that scientifically accepted tests were performed with due caution. Id. The report in the present case did not comply with these requirements and only denoted the identity of the individual who conducted the analysis.
 {¶ 41} R.C. 2925.51(B) requires the State to serve a copy of the report on the accused's attorney prior to any proceeding in which the report is to be used against the accused. The evidentiary presumption is removed where the accused files a demand for testimony within seven days after receiving the report. R.C. 2925.51(C). Furthermore, R.C.2925.51(E) gives the defense a right to have a portion of the substances preserved for testing upon written request to the State. The State is *Page 14 
required to turn over the sample at least fourteen days before trial.
 {¶ 42} Citing State v. Owings, Montgomery App. No. 21429,2006-Ohio-4281, the State contends that Bowshier's late argument for retesting was a sham because Bowshier did not request a portion of the substance for testing prior to trial. However, the factual situation inOwings is unlike the present case. The drugs in Owings were tested a second time because the individual who had conducted the first test was going on a honeymoon and would be unavailable to testify at trial. Id. at ¶ 84. The case had been pending for more than a year, and the defense was given the second report four days before trial. Id. at ¶ 81. Nonetheless, the defendant waited until the morning of trial to file a motion for an independent test and for a continuance. Id. at ¶ 82. We held that the trial court did not err in rejecting the request for an independent test. We noted that the defendant should have requested preservation of the drugs after he received the State's first analysis. Id. at ¶ 83. We also concluded that the State's explanation about the honeymoon was reasonable and did not create an inherent unreliability. Id. at ¶ 84. In contrast, there was only one analysis in the present case, and it was not given to the defense until after trial began.
 {¶ 43} The State also relies on State v. Stephens (1998),124 Ohio App.3d 540, 710 N.E.2d 1160, for the proposition that the individual who conducted the test would have been able to testify in person about the tests that were performed, even if the report had been excluded. Again,Stephens differs from the present case. In Stephens, the trial court offered to continue the trial so that defense counsel could examine the report and have an independent examination performed of the alleged drugs. 124 Ohio App.3d at 551. The defendant rejected the offer of a continuance and stated that he *Page 15 
was ready to proceed. Id.
 {¶ 44} As we mentioned, the preferred remedy for discovery violations is a continuance. Mabry, 2007-Ohio-1895, at ¶ 45-46; Parks,69 Ohio App.3d at 155; and Hirtzinger, 124 Ohio App.3d at 48. The charges against Bowshier were serious felonies and the case had only been pending a few months. There was no need to rush to judgment.
 {¶ 45} Finally, the State argues that there was no prejudice because Bowshier's defense was based on entrapment. Entrapment is an affirmative defense and is established where "the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order to prosecute." State v. Doran (1983),5 Ohio St.3d 187, 449 N.E.2d 1295, paragraph two of the syllabus. According to the State, Bowshier could not deny the criminal act while raising entrapment.
 {¶ 46} In Mathews v. U.S. (1988), 485 U.S. 58, 62, 99 L.Ed.2d 54, 108 S.Ct. 8836, the United States Supreme Court held that "even if the defendant denies one or more elements of the crime, he is entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment." The Supreme Court rejected the state's concern about inconsistency in Matthews, noting that:
 {¶ 47} "`While * * * a defendant may both deny the acts and other elements necessary to constitute the crime charged and at the same time claim entrapment, the high risks to him make it unlikely as a strategic matter that he will choose to do so.'" 486 U.S. at 65-66 (citation omitted). *Page 16 
 {¶ 48} Accordingly, Bowshier was not precluded from challenging the elements of the crime while raising entrapment. More importantly, the State's argument is based on hindsight as to what occurred at trial. Bowshier did not disclose a substantive defense prior to trial, nor was he required to do so. See, e.g., State v. Lane, Union App. No. 14-01-34, 2002-Ohio-2487, at ¶ 9-11 (stating that the Ohio Rules of Criminal Procedure and Ohio Revised Code require defendants only to disclose an alibi defense to the prosecution before trial, not other substantive defenses). Accord, Matthews, 485 U.S. at 65-66 (noting that the "issues of fact in a criminal trial are usually developed by the evidence adduced and the court's instructions to the jury. A simple plea of not guilty, Fed. Rule Crim. Proc. 11, puts the prosecution to its proof as to all elements of the crime charged, and raises the defense of entrapment. * * * The only matters required to be specially pleaded by a defendant are notice of alibi, Fed. Rule Crim. Proc. 12.1, or of intent to rely on insanity as a defense, Fed. Rule Crim. Proc. 12.2.) Bowshier was, therefore, free to elect among possible defense theories and to require the State to prove the elements of the crime.[3]
 {¶ 49} As an additional matter, a claim that the substances in question were not cocaine is not necessarily inconsistent with entrapment. One could reasonably *Page 17 
conclude that a defense of non-involvement is inconsistent with a claim that the government "made me do it." However, a claim that the government enticed an individual into participating in an alleged drug transaction does not necessarily mean that the substances involved were, in fact, illegal drugs.
 {¶ 50} The First Assignment of Error is sustained.
 III {¶ 51} Bowshier's Second Assignment of Error is as follows:
 {¶ 52} "THE TRIAL COURT ERRED WHEN IT FAILED TO ALLOW APPELLANT THE RIGHT TO COUNSEL AS GUARANTEED BY THE OHIO AND UNITED STATES CONSTITUTIONS."
 {¶ 53} This assignment of error challenges the trial court's rejection of Bowshier's request to substitute counsel on the day of trial. Bowshier contends that a severe breakdown in the attorney-client relationship existed, justifying a change of counsel.
 {¶ 54} Bowshier's trial counsel was retained, rather than appointed. In a similar situation, we have noted that existing authority only imposes a duty on trial courts to inquire into complaints a defendant raises about appointed counsel. State v. Downing, Greene App. No. 2001-CA-78, 2002-Ohio-1302, 2002 WL 441353, *5, discussing State v.Deal (1969), 17 Ohio St.2d 17, 244 N.E.2d 742 and its progeny. Although we expressed reservations in Downing about whether the duty applies to retained counsel, we assumed for purposes of argument that the duty to inquire exists where counsel is retained rather than appointed.2002 WL 441353 at *6. We will take the same approach here.
 {¶ 55} In Downing, we observed that: *Page 18 
 {¶ 56} "Even when complaints are made regarding appointed counsel, the court will only intervene if the defendant can show `a breakdown in the attorney-client relationship of such magnitude as to jeopardize the defendant's right to effective assistance of counsel.' * * * `Mere personality conflicts or disputes regarding trial strategy are insufficient to warrant the appointment of new counsel.'" Id. (Citations omitted.)
 {¶ 57} On the first day of trial, Bowshier asked to fire his attorney and seek new counsel. Bowshier claimed that he had paid to be represented by a particular attorney, but a different attorney from the same office had been placed on the case without his consent only four or five days before trial. Bowshier also alleged that his attorneys had been untruthful with him about the content of a proposed plea bargain and about who would represent him at trial.
 {¶ 58} In response, Bowshier's attorney stated that Bowshier had been told from the beginning that the choice of attorney would depend on trial strategy. Bowshier had agreed to this in a signed contract, knew well ahead of time that his current counsel would be trying the case, and had expressed no concern about the matter. The State also indicated that the proposed plea agreement was as Bowshier's current attorney had represented (a fifteen-year sentence) and had never been lower (Bowshier reported that other attorneys in the office had said that the State's offer was a five-year sentence).
 {¶ 59} After speaking with Bowshier, the trial court overruled the motion for substitute counsel. The trial court stated that even if the proposed plea agreement had been as Bowshier suggested, the State could withdraw its proposal at any time. The *Page 19 
court also assured Bowshier that his current attorney was very competent.
 {¶ 60} There is a suggestion of bad faith for the purposes of delay where a motion to substitute counsel is made the day of trial, if the trial date has been set sufficiently far in advance. State v.Haberek (1988), 47 Ohio App.3d 35, 546 N.E.2d 1361. In Haberek, the trial court found an inference of bad faith where the defendant waited until the day of trial to move for substitution of counsel, even though the trial date had been set two months earlier. The appellate court found that the trial court did not abuse its discretion in suggesting that the defendant had an improper motive. 47 Ohio App.3d at 41.
 {¶ 61} The inference of bad faith is substantially less apparent in the present case, because Bowshier had short notice of the trial date — only one week. The trial court also refused to grant a continuance that could have avoided the problem, as the attorney moving for a continuance based on lack of time to prepare and scheduling conflicts was the attorney Bowshier had chosen to try his case. This issue is not before us, however, because Bowshier has not contended on appeal that the trial court abused its discretion in rejecting the motion for continuance. (If he were so contending, that issue would be moot, in view of our disposition of his First Assignment of Error.)
 {¶ 62} Despite the apparent lack of bad faith in the request, we cannot say that the breakdown in the relationship was severe enough to jeopardize Bowshier's right to counsel. State v. Arrone, Greene App. No. 2005 CA 89, 2006-Ohio-4144, at ¶ 17. Although Bowshier and his attorney expressed some displeasure with each other, any hostility or tension did not interfere with presentation of the defense. State v. Henness,79 Ohio St.3d 53, 66, 1997-Ohio-405, 679 N.E.2d 686. Bowshier was also careful to *Page 20 
note that his current trial counsel was not the one who had been untruthful.
 {¶ 63} In light of the preceding discussion, the Second Assignment of Error is overruled.
 IV {¶ 64} Bowshier's Third Assignment of Error is as follows:
 {¶ 65} "THE VERDICT OF THE JURY WITH RESPECT TO COUNT SIX WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 66} Count Six of the indictment charges Bowshier with knowingly obtaining, possessing, or using powder cocaine in an amount exceeding twenty-five grams, but less than one hundred grams. This count was based on cocaine found during a search executed in a home in which Bowshier resided. Bowshier was not home at the time. The other residents of the home included Bowshier's girlfriend, Amy Ware, their two children, and another adult female, Jessica Jakes. During the search, the police found a black duffel bag containing suspected marijuana and cocaine in an open area in the basement of the house. The cocaine taken from this item was identified as being 11.83 grams in weight. The police also found cocaine in the following areas and amounts: (1) 4.72 grams in a red leather purse located in an upstairs hallway closet that also contained Christmas storage items, luggage, and some clothes; (2) 16 grams located between the bed mattresses in an upstairs bedroom occupied by Jakes; and (3) 0.52 grams found in a round tin in Jakes's bedroom. No fingerprints or DNA evidence were taken from these items, and the police never inquired about who owned the purse. Sergeant Turner, who was in charge of the narcotics unit of the police department, testified that the cocaine found in Jakes's bedroom had no relation to Bowshier. *Page 21 
 {¶ 67} Bowshier contends that his conviction for possession of the drugs listed in Count Six is against the manifest weight of the evidence because there is no evidence directly connecting him with these items. In response, the State asserts that two or more persons may be in constructive possession of the same drugs. The State also claims that sufficient evidence of constructive possession exists because the cocaine was throughout the premises and for the most part was in plain view. And finally, the State relies on the fact that Bowshier ran into his home to obtain the two kilos of cocaine for the meeting with Rio. According to the State, Bowshier's actions suggest that Boshwier knew there was more cocaine in the home beyond the amount that was taken to the meeting.
 {¶ 68} "When a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact `clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' * * * Because the trier of fact sees and hears the witnesses and is particularly competent to decide `whether, and to what extent, to credit the testimony of particular witnesses,' we must afford substantial deference to its determinations of credibility. * * * A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances." Stubbs, 2006-Ohio-3858, at ¶ 21 (citations omitted).
 {¶ 69} Under R.C. 2925.01(K), possession "means having control over a thing or substance, but may not be inferred solely from mere access to the thing or substance through ownership or occupation of the premises upon which the thing or substance is *Page 22 
found." The concept is well accepted that possession may be "actual or constructive." State v. Kobi (1997), 122 Ohio App.3d 160, 174,701 N.E.2d 420. Furthermore, in the context of possession, "circumstantial evidence has the same probative value as direct evidence." State v.Harris, Cuyahoga App. No. 88787, 2007-Ohio-4173, at ¶ 18.
 {¶ 70} "To place a defendant in constructive possession, the evidence must demonstrate that the defendant was able to exercise dominion or control over the items. 122 Ohio App.3d at 174. However, there must be a showing that the accused was aware of the contraband." State v.Givens, Clark App. No. 2005-CA-42, 2005-Ohio-6670, at ¶ 10.
 {¶ 71} The presence of "readily usable drugs found in very close proximity to a defendant may constitute circumstantial evidence and support a conclusion that the defendant had constructive possession of such drugs." State v. Kobi, 122 Ohio App.3d 160, at 174 (citations omitted). In Kobi, the defendant lived with his parents and much of the contraband that was seized was found in his bedroom. Cocaine was found directly outside the defendant's bedroom door, just inside an attic trap door in the ceiling, and the door was accessed by a ladder. Under the circumstances, the appellate court concluded that reasonable minds could differ as to whether the defendant constructively possessed cocaine.122 Ohio App.3d at 174-75. As a result, the court held that the State did not fail to prove that the defendant possessed cocaine. Id.
 {¶ 72} Unlike in Kobi, the cocaine that formed part of the basis for the indicted crime in Count Six was found in the bedroom of an individual other than the defendant, and the State failed to present any evidence connecting the defendant with these drugs. In fact, the evidence was to the contrary — the State's own witness indicated the drugs *Page 23 
in Jakes's bedroom had no relation to Bowshier. Yet, Bowshier was charged with and convicted of possession of these drugs.
 {¶ 73} Another circumstantial method of establishing a defendant's awareness and constructive possession is "when the drugs are in plain view in an area shared with another." Givens, 2005-Ohio-6670 at ¶ 10. In this regard, the State contends that cocaine was in "plain view for the most part" throughout the premises. However, that is not supported by the evidence.
 {¶ 74} The drugs found in Jakes's bedroom were between the mattresses of the bed and in a tin, and were obviously not in "plain view." Likewise, a small amount of cocaine was found inside a red purse in an upstairs hall closet packed with other items like luggage, clothing, and Christmas ornaments. Again, the drug was not in plain view. Finally, the black duffel bag was found in the basement of the house, but the drugs were inside the main compartment of the bag and inside a side pouch. The State did not present any evidence that the drugs themselves were in plain view. The duffel bag may have been in plain view, but that is not to say that the drugs were in plain view.
 {¶ 75} In Givens, we reversed the defendant's conviction on a cocaine charge where the drug was found hidden in an ottoman in a bedroom that the defendant shared with his girlfriend. The girlfriend testified that she had hidden the cocaine from the defendant and that it was hers. Id. at ¶ 14.
 {¶ 76} Although Jakes did not testify in the present case, the State's own witness testified that the cocaine found in Jakes's bedroom had no relation to Bowshier. Therefore, "the jury clearly lost its way in concluding that the State had proven" Bowshier's guilt as to the cocaine found in the bedroom by the requisite proof. Id. As *Page 24 
we noted, Bowshier was charged in the Sixth Count with possession of between twenty-five and one hundred grams of cocaine. According to the State's evidence, the total weight of the cocaine in the bedroom, red purse, and black duffel bag was 33.07 grams. However, if the cocaine from the bedroom is eliminated, the weight is reduced to 16.55 grams, which is below the amount listed in the indictment.
 {¶ 77} We also conclude that the evidence does not support a finding that Bowshier was in possession of the 4.72 grams found in the red purse. While this object was in an area that could be accessed in common by the occupants of the house, there was no evidence indicating that Bowshier had any connection with this object. It is not reasonable to assume that a male is associated with a purse — at least in the absence of any other evidence.
 {¶ 78} The State contends that Bowshier's visit to the home before the alleged sale to retrieve cocaine and the fact that cocaine was in plain view are circumstantial evidence that the cocaine belonged to Bowshier. We have already rejected the "plain view" argument, because it is factually incorrect. Unlike the items in Jakes's bedroom, however, the duffel bag was found in an area that was apparently accessible to all occupants of the house.[4] Therefore, the issue would be whether other evidence indicated that Bowshier had constructive possession of the duffel bag.
 {¶ 79} In State v. Scalf (1998), 126 Ohio App.3d 614, 710 N.E.2d 1206, the defendant was present on the steps of his home when his son sold a confidential *Page 25 
informant a bag of cocaine. After obtaining a search warrant, the police searched the home three days later and found five rocks of cocaine in the common area of the kitchen and a bag, spoon, and tray with suspected cocaine residue in an upstairs sitting room. The defendant's personal papers were also found in the sitting room. 126 Ohio App.3d at 617. Although the defendant denied that the drugs were his, the Eighth District Court of Appeals concluded that the conviction for possession was supported by sufficient evidence. Id. at 619.
 {¶ 80} In a subsequent case, we discussed Scalf and other decisions where the defendant was not present when drugs or illegal items were found, and, therefore, raised the issue of constructive possession. SeeState v. Weber (Mar. 14, 2000), Montgomery App. No. 17800,2000 WL 299564 (reversing conviction based on the fact that the evidence was insufficient as a matter of law to support defendant's conviction for possession of drugs and weapons). We noted in Weber that there was no evidence that the defendant in Scalf had been present during the search. However, there was additional evidence of his participation in a controlled drug sale three days earlier. Id. at *5. We distinguished this from situations in which the only evidence linking a defendant to constructive possession is ownership or leasing of a property. Id.
 {¶ 81} As in Scalf, there is additional evidence in this case in the form of Bowshier's participation in an alleged drug sale. The police staked out Bowshier's residence and saw Bowshier enter the house empty-handed about twenty minutes before the proposed exchange. Bowshier was inside for about five minutes and then exited, carrying a white plastic grocery bag. A female had entered the residence and had stayed inside that morning, but no one entered or exited after Bowshier left. *Page 26 
Bowshier then drove directly to the exchange site and showed Del Rio a white plastic bag containing money and the suspected cocaine.
 {¶ 82} In view of these facts, we agree with the State that Bowshier's trip to the house was circumstantial evidence that could have supported a charge connected with the contents of the black duffel bag. A jury could reasonably infer under the circumstances that Bowshier had constructive possession of the drugs in the duffel bag. However, as we have noted, the amount of drugs in the duffel bag was not sufficient to prove the matters alleged in Count Six of the indictment. Accordingly, the verdict finding Bowshier guilty on Count Six is against the manifest weight of the evidence.
 {¶ 83} Bowshier's Third Assignment of Error is sustained.
 V {¶ 84} Bowshier's Fourth Assignment of Error is as follows:
 {¶ 85} "APPELLANT WAS PREJUDICED BY PROSECUTORIAL MISCONDUCT COMMITTED THROUGHOUT THE TRIAL."
 {¶ 86} Under this assignment of error, Bowshier contends that the prosecutor committed two specific acts of misconduct. The first is the willful failure to produce discovery. Because we have rejected the contention that the State acted willfully in failing to disclose discovery, we will not address this issue further.
 {¶ 87} The second alleged act of misconduct is based on the fact that the State placed a large quantity of marijuana on the railing of the jury box even though Bowshier had not been charged with regard to the marijuana. Bowshier argues that the marijuana was not admissible and served to inflame the jury. *Page 27 
 {¶ 88} Regarding the admission of evidence, we have previously held that:
 {¶ 89} "The test for prosecutorial misconduct is whether the remarks made were improper and if so, whether they prejudicially affected substantial rights of the accused. * * * The use or attempt to use inadmissible evidence does not necessarily demonstrate prosecutorial misconduct. There must also be some breach of a duty that the prosecutor was required to observe and a resulting substantial prejudice to the accused's right to a fair trial." State v. Cook (June 29, 1994), Montgomery App. No. 14013, 1994 WL 285052, *2 (citations omitted).
 {¶ 90} The touchstone of the analysis is "`is the fairness of the trial, not the culpability of the prosecutor.'" State v. Drummond,111 Ohio St.3d 14, 45, 2006-Ohio-5084, 854 N.E.2d 1038, at ¶ 226, quoting from Smith v. Phillips (1982), 455 U.S. 209, 219, 102 S.Ct. 940,71 L.Ed.2d 78.
 {¶ 91} After reviewing the record, we conclude that the prosecutor did not attempt to use inadmissible evidence. Evid. R. 402 provides that all relevant evidence is admissible. Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid. R. 401. However, under Evid. R. 403, even relevant evidence may be excluded if "its probative value is substantially outweighed by the danger of unfair prejudice."
 {¶ 92} The rather large amount of marijuana used as an exhibit was the marijuana involved in the alleged drug sale and was relevant to illustrate the terms of the transaction. Although photos of the marijuana would have been sufficient, we see no prejudice in the State's decision to bring the marijuana into the courtroom. Because the *Page 28 
evidence was relevant and no prejudice occurred, the State was not guilty of prosecutorial misconduct. Accordingly, the Fourth Assignment of Error is overruled.
 VI {¶ 93} Bowshier's Fifth Assignment of Error is as follows:
 {¶ 94} "THE TRIAL COURT ERRED IN RULING ON PROPOSED JURY INSTRUCTIONS."
 {¶ 95} At trial, the court rejected a jury instruction on entrapment in connection with Count Two of the indictment, which alleged possession of cocaine in an amount exceeding 1,000 grams. Bowshier contends that the trial court erred because there was sufficient evidence of entrapment to justify an instruction. In addition, Bowshier argues that the jury was confused because the trial court did give an entrapment instruction on Count One of the indictment, which charged Bowshier with trafficking in cocaine. Both Counts One and Two involved the same cocaine, but raised different charges.[5] Finally, Bowshier contends that his right to remain silent was violated when the trial court said it would reconsider its rejection of the entrapment defense on Count Two if Bowshier testified.
 {¶ 96} "Crim. R. 30(A) requires a trial court to `fully and completely give the jury all instructions which are relevant and necessary for the jury to weigh the evidence and *Page 29 
discharge its duty as the fact-finder.' * * * In reviewing the record to ascertain the presence of sufficient evidence to support the giving of a proposed jury instruction, an appellate court should determine whether the record contains evidence from which reasonable minds might reach the conclusion sought by the instruction. * * * However, a trial court does not err in failing to instruct the jury on an affirmative defense where the evidence is insufficient to support the instruction." State v.Strunk, Warren App. No. CA-2006-04-046, 2007-Ohio-683, at ¶ 16
(citations omitted). As we mentioned, entrapment is an affirmative defense and is established where "the criminal design originates with the officials of the government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order to prosecute." Doran (1983), 5 Ohio St.3d 187, at paragraph two of the syllabus.
 {¶ 97} The State contends that an entrapment instruction was not warranted on the possession charge because there was no evidence that the police implanted the idea to obtain cocaine. According to the State, Bowshier told Del Rio at their first meeting that he "had the powder," and there was no evidence that Bowshier acquired the cocaine for purposes of making the deal.
 {¶ 98} We disagree with the State. Our review of the trial transcript indicates that there was evidence that the police proposed the exchange of both money and cocaine for the marijuana prior to the time that Bowshier first met with Del Rio.
 {¶ 99} As was noted above, the informant, Snook, initially contacted Detective Woodruff on September 29, 2005. Based on his discussion with Snook, Woodruff contacted Del Rio, and the three men met in person on October 10, 2005. However, a *Page 30 
plan was developed before that meeting — as of October 3, 2005. The plan was that Del Rio, posing as a drug dealer, would offer Bowshier the following deal: 200 pounds of marijuana at a price of $800 a pound, for a total of $160,000, with Del Rio being willing to accept $40,000 and two kilos of cocaine as a down payment.
 {¶ 100} Del Rio and Bowshier first met in person on October 14, 2005. They had a number of phone conversations prior to this meeting, but Del Rio testified that he and Bowshier had not spoken of the terms before their face-to-face meeting. The trial court's conclusion that an entrapment instruction was not proper for the cocaine possession offense was based on this fact and the fact that Bowshier said at this meeting that he "had the powder." The trial court concluded that Bowshier already had possession of the cocaine and there was no evidence that Bowshier acquired it for purposes of the deal.
 {¶ 101} However, the trial court ignored evidence that Snook had
communicated terms to Bowshier before the meeting between Bowshier and Del Rio on October 14. Woodruff indicated in his testimony that there were phone calls between Snook and Bowshier prior to October 14. In addition, Del Rio testified as to terms that had been communicated to Bowshier by Snook. In this regard, Del Rio testified during cross-examination as follows:
 {¶ 102} "Q. On October 3, 2005, you and Detective Woodruff had already decided what the plan was going to be as far as what this was going to be about; correct?
 {¶ 103} "A. Between Mr. — between Detective Woodruff and I, yes.
 {¶ 104} "Q. You had already determined you were going to sell — attempt to *Page 31 
sell 200 pounds; correct?
 {¶ 105} "A. Correct.
 {¶ 106} "Q. And how much the price would be, 800 dollars per pound.
 {¶ 107} "A. That's right.
 {¶ 108} "Q. You were going to ask for 40,000 dollars and 2 kilos?
 {¶ 109} "A. That's correct.
 {¶ 110} "Q. And that was going to be half a down payment and-presumably the rest would be paid later.
 {¶ 111} "A. That's right.
 {¶ 112} "Q. And those were the actual — the terms throughout; correct?
 {¶ 113} "A. That is correct.
 {¶ 114} "Q. And the same terms that you and Detective Woodruff decided on on October 3, 2005, were the same ones that you proposed to Mr. Bowshier?
 {¶ 115} "A. Yes.
 {¶ 116} "Q. And the same ones that you kept using throughout this whole transaction.
 {¶ 117} "A. Sort of.
 {¶ 118} "Q. Sort of. Until you started to modify them down lower and lower because he didn't have the money; but in essence, that's what you were asking for.
 {¶ 119} "A. Correct, yes." Trial Transcript, pp. 105-107.
 {¶ 120} Later in the cross-examination, Del Rio testified that Bowshier had said at the October 14, 2005 meeting that he could not come up with $40,000. Del Rio told Bowshier to get what he could. Id. at 109. The following exchange then occurred *Page 32 
during Del Rio's cross-examination:
 {¶ 121} "Q. You're willing to go down to whatever you need to be — look legit but to get this done-
 {¶ 122} "A. Yes.
 {¶ 123} "Q. — correct? Because the purpose of everything was to get him to do this?
 {¶ 124} "A. Yes, ultimately it was to — to do the deal with him, yes.
 {¶ 125} "Q. Not ultimately, at the — ultimately, but also at the beginning. I mean before you even met Mr. Bowshier.
 {¶ 126} "A. Yeah, that's correct.
 {¶ 127} "Q. The plan was to get this done under, you know, to get 200 pounds sold to him.
 {¶ 128} "A. That's correct.
 {¶ 129} "Q. That's why you told him, `I won't do anything under 200
 {¶ 130} "A. That's correct.
 {¶ 131} "Q. And that's when you tell him, `Look, just get what you can.'?
 {¶ 132} "A. Right.
 {¶ 133} "Q. And he told you he didn't have the money?
 ¶ 134} "A. He told me he didn't have the $40,000, that's right.
 {¶ 135} "Q. Did you suggest to him or did he suggest to you that you would sell him the 200 pounds of marijuana for 40,000 and 2 kilos? *Page 33 
 {¶ 136} "A. I asked him what Snooky told him I could do; and herepeated to me what Snooky had told him, which was that price." Trial Transcript, p. 110-111. (Emphasis added).
 {¶ 137} This testimony indicates that Bowshier was aware of the proposed terms of the agreement before meeting with Del Rio and that Bowshier did not necessarily have possession of the cocaine before being approached by the government.
 {¶ 138} As we noted earlier, Detective Woodruff testified that Bowshier provided the particulars of the deal to Snook. However, no evidence was presented at trial to indicate that Snook and Bowshier spoke before the October 3, 2005 meeting in which the police decided what the terms were to be. At most, Woodruff's testimony is inconsistent with Del Rio's testimony and creates a factual issue for the jury.
 {¶ 139} Accordingly, to the extent that the trial court concluded that an entrapment instruction was warranted on the trafficking charge, the same instruction would have been required on the possession charge as well. The trial court's failure to give the instruction, therefore, lacked a sound reasoning process and was an abuse of discretion.AAAA Enterprises, Inc. v. River Place Community Urban RedevelopmentCorp. (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597.
 {¶ 140} In view of this holding, we need not consider whether the trial court violated Bowshier's right to remain silent. We do note that the nature of an entrapment defense requires:
 {¶ 141} "[T]he accused to adduce supporting evidence of his lack of predisposition. The accused, as a participant in the commission of the crime, will be *Page 34 
aware of the circumstances surrounding the crime, and is at no disadvantage in relaying to the fact-finder his version of the crime as well as the reasons he was not predisposed to commit the crime. Moreover, the accused will certainly be aware of his previous involvement in crimes of a similar nature which may tend to refute the accused's claim that he was not predisposed to commit the offense. In summary, none of the evidence which is likely to be produced on the issue of predisposition would be beyond the knowledge of the accused or his ability to produce such evidence." Doran, 5 Ohio St.3d at 193.
 {¶ 142} Although there may theoretically be alternative ways of proving lack
of predisposition to commit an offense, a defendant may feel compelled, as a practical matter, to testify on that subject to meet his burden of proof, just as a defendant in a murder case may feel compelled, as a practical matter to testify on the issue of self-defense to meet his burdens of proof on that issue. The practical necessity of testifying on an issue upon which a criminal defendant bears the burden of proof does not violate the Fifth Amendment.
 {¶ 143} The Fifth Assignment of Error is sustained.
 VII {¶ 144} Bowshier's Sixth Assignment of Error is as follows:
 {¶ 145} "APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL."
 {¶ 146} Under this assignment of error, Bowshier contends as an alternative proposition that if the First Assignment of Error is not sustained, trial counsel would have been ineffective in failing to request an independent sample of the drugs for testing. *Page 35 
Since we have sustained the First Assignment of Error, this assignment of error is overruled as moot.
 VIII {¶ 147} Bowshier's Seventh Assignment of Error is as follows:
 {¶ 148} "THE TRIAL COURT ERRED IN ORDERING THE FORFEITURE OF PERSONAL PROPERTY OF APPELLANT."
 {¶ 149} The indictments filed in this case contained specifications for forfeiture of various property, including $21,196 that was seized at the time of the alleged drug transaction. Initially, the trial court included the forfeiture specifications in the jury instructions and verdict forms. Before the case was submitted to the jury, however, the trial court told the parties that the forfeiture statute appeared to require a special proceeding. The judge then instructed the jury not to consider forfeiture and to disregard any comments about forfeiture of property.
 {¶ 150} At the sentencing hearing, which was conducted immediately after the jury verdict, the trial court imposed a total aggregate sentence of thirty years and a $30,000 fine, and ordered forfeiture of the $21,196. When defense counsel objected and asked the basis of the forfeiture, the trial court stated that "it's clear and obvious that the money was used to commit the felony drug abuse offense for which the defendant was convicted." Trial Transcript, p. 244.
 {¶ 151} Bowshier contends that the trial court erred in failing to follow the forfeiture procedure outlined in R.C. 2925.42. The State does not address whether the procedure was correct, but simply says that R.C.2925.42(A)(1)(b) applies because the *Page 36 
money was used to commit a felony drug offense.
 {¶ 152} At the time of Bowshier's conviction, R.C. 2925.42(A)(1) provided, in pertinent part, that:
 {¶ 153} "In accordance with division (B) of this section, a person who is convicted of or pleads guilty to a felony drug abuse offense, * * * loses any right to the possession of property and forfeits to the state any right, title, and interest he may have in that property if either of the following applies:
 {¶ 154} "* * *
 {¶ 155} "(b) The property was used or intended to be used in any manner to commit, or to facilitate the commission of, the felony drug abuse offense or act."
 {¶ 156} We agree with the State that Section 2925.42(A)(1)(b) is the relevant section of the forfeiture statute. However, that does not mean that the trial court followed the correct procedure.
 {¶ 157} R.C. 2925.42(B)(1) provides that forfeiture of property described in R.C. 2925.42(A)(1) is precluded unless the property is appropriately described in the indictment or the property was not reasonably foreseen to be subject to forfeiture and the prosecutor has given appropriate notice. R.C. 2925.42(B)(3) then outlines these specific procedures for forfeiture that must be followed:
 {¶ 158} "(a) If a person is convicted of or pleads guilty to a felony drug abuse offense, * * * then a special proceeding shall be conductedin accordance with this division to determine whether any propertydescribed in division (B)(1)(a) or (b) of this section will be thesubject of an order of forfeiture under this section. Except as otherwise provided in division (B)(3)(b) of this section, the jury inthe felony drug abuse *Page 37 offense criminal action or in the delinquent child action or, if that action was a nonjury action, the judge in that action shall hear andconsider testimony and other evidence in the proceeding relative towhether any property described in division (B)(1)(a) or (b) of thissection is subject to forfeiture under this section. If the jury orjudge determines that the prosecuting attorney has established, by apreponderance of the evidence, that any property so described is subjectto forfeiture under this section, the judge or juvenile judge shallrender a verdict of forfeiture that specifically describes the right,title, or interest in property or the property that is subject toforfeiture under this section. The Rules of Evidence shall apply in theproceeding." (b) If the trier of fact in a felony drug abuse offense criminal action * * * was a jury, then, upon the filing of a motion by the person who was convicted of or pleaded guilty to the felony drug abuse offense * * * the determinations in the proceeding described in this division instead shall be made by the judge in the felony drug abuse offense criminal action * * *." (Emphasis added.)
 {¶ 159} These procedures require a separate proceeding before a jury, unless the defendant files a motion under R.C. 2925.42(B)(3)(b) asking for the forfeiture decision to be made by the judge. In State v.Hill, 70 Ohio St.3d 25, 1994-Ohio-12, 635 N.E.2d 1248, the Ohio Supreme Court stressed that "forfeiture of property, pursuant to R.C. 2925.42, is a form of punishment for a specified offense and, therefore, is a fine for purposes of Section 9, Article I of the Ohio Constitution and the Eighth Amendment to the United States Constitution." Id. at 34. The court thus noted that "prior to entering an order of forfeiture, the trial court must make an independent determination whether forfeiture of that property is an `excessive fine' prohibited by the Excessive Fine Clauses of the Ohio and United States Constitutions." Id. Because the trial court in the present *Page 38 
case entered an order of forfeiture without complying with the statutory requirements, the order of forfeiture is invalid.
 {¶ 160} R.C. 2925.42(B)(4) further states that "[i]n a felony drug abuse offense criminal action * * *, if the trier of fact is a jury, thejury shall not be informed of any specification described in division(B)(1)(a) of this section or of any property described in that divisionor division (B)(1)(b) of this section prior to the alleged offenderbeing convicted of or pleading guilty to the felony drug abuse offense* * *." (Emphasis added.) The trial court violated this provision of the statute as well, by informing the jury of the forfeiture specifications prior to Bowshier's conviction.
 {¶ 161} Furthermore, the trial court also incorrectly stated that the property was subject to forfeiture simply because Bowshier used the money to attempt to commit the drug offense. R.C. 2925.42(C) states that:
 {¶ 162} "There shall be a rebuttable presumption that any right, title, or interest of a person in property described in division (A)(1) of this section is subject to forfeiture under division (B) of this section, if the state proves both of the following by a preponderance ofthe evidence:
 {¶ 163} "(1) The right, title, or interest in the property was acquired by the offender during the period of the commission of the felony drug abuse offense or act that, if committed by an adult, would be a felony drug abuse offense, or within a reasonable time after that period.
 {¶ 164} "(2) There is no likely source for the right, title, or interest in the property other than proceeds obtained from the commission of the felony drug abuse offense or act." (Emphasis added.) *Page 39 
 {¶ 165} As with any rebuttable presumption, once the State satisfies its burden, the defendant would be entitled to present evidence to rebut the presumption. The decision would then rest with the trier of fact, which in this situation would be the jury, unless the defendant has filed a motion under R.C. 2925.42(B)(3)(b) asking for the judge to be the trier of fact. See, e.g., State v. Balwanz, Belmont App. No. 02-BE-37, 2004-Ohio-1534, at ¶ 51 (noting that the State has the burden of presenting sufficient evidence to support forfeiture).
 {¶ 166} The Seventh Assignment of Error is sustained.
 IX {¶ 167} Bowshier's Eighth Assignment of Error is as follows:
 {¶ 168} "THE VERDICT OF THE JURY WITH RESPECT TO COUNTS I, II, AND V WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 169} Under this assignment of error, Bowshier contends that the jury verdict on Counts One, Two, and Five were against the weight of the evidence because the defense presented sufficient evidence of entrapment. Counts One and Two alleged trafficking and possession, respectively, in connection with the two kilos of suspected cocaine that were confiscated at the time of the sale. Count Five involved possession of the marijuana that was found in the duffel bag at Bowshier's home. In view of the disposition of the First, Third, and Fifth Assignments of Error, which have found errors requiring reversal and remand of the case, this assignment of error is moot. *Page 40 
 {¶ 170} Bowshier's Ninth Assignment of Error is as follows:
 {¶ 171} "THE TRIAL COURT ERRED IN THE IMPOSITION OF SENTENCE ON APPELLANT."
 {¶ 172} The trial court imposed maximum and consecutive sentences in this
case, resulting in an aggregate sentence of thirty years. The court also imposed sentence immediately after the verdict and made no findings on the record with regard to its reasons for imposing sentence. Subsequently, the trial court did file an entry stating that it had considered "the record, oral statements, any victim impact statement [sic], as well as the principles and purposes of sentencing under Ohio Revised Code Section 2929.11, and has balanced the seriousness and recidivism factors Ohio Revised Code Section 2929.12."[6]
 {¶ 173} Bowshier contends that the court erred by failing to make specific findings when imposing a consecutive sentence. In response, the State contends that the authority Bowshier relies on has been superseded by State v. Foster, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470.
 {¶ 174} Bowshier was sentenced on March 28, 2006, less than two months after the Ohio Supreme Court decided Foster. Foster applied to all cases pending on review or not yet final, and held that trial courts "have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum *Page 41 
sentences." Id. at paragraph seven of the syllabus and at ¶ 106.
 {¶ 175} Although Foster does apply to the present case, we need not address this assignment of error. In view of the disposition of the First, Third, Fifth, and Seventh Assignments of Error, which require reversal and remand of the case, the Ninth Assignment of Error is moot.
 XII {¶ 176} Bowshier's First, Third, Fifth, and Seventh Assignments of Error having been sustained, and his other assignments of error having been either overruled or declared moot, the judgment of the trial court is Reversed, and this cause is Remanded for further proceedings consistent with this opinion.
WOLFF, P.J., and GRADY, J., concur.
[1] There is a conflict in evidence on this point. Woodruff testified during the defense case that the particulars of the deal were based on information that Bowshier communicated to Snook.
[2] We would characterize the entrapment defense tendered in this case as weak, on the issue of the defendant's predisposition, or lack thereof, to commit the offense.
[3] Some courts refuse to apply Matthews because it was not based on constitutional grounds and is not binding on the states. See discussion in Suits v. State (Idaho App. 2006), 143 Idaho 160, 139 P.3d 762, 765. In these situations, courts require the defendant to admit the offense with which he or she is charged before being allowed to submit an entrapment instruction to the jury. Id. Ohio does not require such an admission before courts can give an entrapment instruction. However, even if Ohio followed such a rule, it would have no bearing on the failure to disclose evidence. The defendant's admission is relevant to the issue of what jury instructions are allowed, not to discovery violations that occur prior to trial. Again, the State's argument in this regard is based on hindsight.
[4] We say "apparently," because the State's evidence on this point was sparse. The detective merely testified that the duffel bag was in the basement, in a room that did not have a lot of furniture, but was occupied. The bag was sitting in the middle of the room.
[5] Bowshier has confused these matters in his brief, contending that the court gave an entrapment instruction on the possession charge and not on the trafficking charge. However, the record indicates that the entrapment instruction was given with regard to the trafficking charge. Accordingly, we will address the instructions as they were actually given. Notably, the trafficking and possession charges (Counts One and Two, respectively), both contained a major drug offender specification.
[6] There are no victim impacts statements, nor is there anything in the record constituting pre-sentence investigation reports, etc. The State made a few oral remarks at the disposition hearing, which occurred immediately after the jury returned its verdict. *Page 1